David A. Bahr (OSB No. 90199)
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471 Voice
(541) 485-2457 Fax
bahr@westernlaw.org
HBPA's Trial Counsel

Richard A. Poulin (WSBA No. 27782)
SCOPE Law Firm, PLLC
P.O. Box 22091
Seattle, WA 98122-0091
(206) 420-1590 Voice
(206) 420-2545 Fax
rickp@scopelaw.com
HBPA's Local Counsel

Stephen Tan, (WSBA No. 22756)
Cascadia Law Group, PLLC
1201 Third Avenue
Suite 320
Seattle, WA 98101
(206) 292-2657 Voice
(206) 292-6300 Fax
stan@cascadialaw.com
Sierra Club's Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **HOGBACK BASIN PRESERVATION ASSOCIATION, and SIERRA CLUB,**<br><br>        Plaintiffs,<br><br>    vs.<br><br>**UNITED STATES FOREST SERVICE, and WHITE PASS COMPANY,**<br><br>        Defendants. | Case No. CV-07-_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

/ / /

COMPLAINT                                    1

# I. INTRODUCTION

**1.**     This is an action for declaratory and injunctive relief challenging the Record of Decision ("ROD") and the Final Environmental Impact Statement ("FEIS") issued by the United States Forest Service for the White Pass Ski Area expansion. Plaintiffs, the Hogback Basin Preservation Association, and Sierra Club, challenge the decision by the U.S. Forest Service denying their administrative appeal and approving the ROD and FEIS for the proposed White Pass Ski Area expansion.

**2.**     This action arises under, and alleges violation of, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq.*; the implementing regulations of these laws; the Administrative Procedures Act ("APA"), 5 U.S.C. § 501, *et seq.*; and various laws and policies protecting the rights and interests of the plaintiffs in this matter.

**3.**     This complaint challenges specifically the following actions: (1) defendant's decision, by and through the Gifford Pinchot National Forest Supervisor and the Okanogan and Wenatchee National Forests Supervisor approving the expansion of the White Pass Ski Area as permitted by the ROD dated June 14, 2007; (2) the decision by the Gifford Pinchot National Forest Supervisor and Okanogan and Wenatchee National Forests Supervisor approving Amendment No. 19 to the Gifford Pinchot National Forest Plan as contained in the Record of Decision dated June 14, 2007; and, (3) the FEIS for the proposed expansion of the White Pass Ski Area dated June, 2007. Plaintiffs seek an order directing the U.S. Forest Service to withdraw its ROD and FEIS.

**4.**     Until the defendant United States Forest Service complies with the requirements of NEPA, NFMA, the APA, and the rules and regulations implementing these laws, plaintiffs will seek

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

temporary, preliminary, or permanent injunctions against any federally approved activities that in any way relate to the proposed ski area expansion, and any other such relief as plaintiffs deem appropriate.

**5.**    This relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment and to plaintiffs' interests.

## II. JURISDICTION AND VENUE

**6.**    Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

**7.**    The actions at issue, the approval of a Record of Decision and Final Environmental Impact Statement were issued for the expansion of the White Pass Ski Area. The area slated for expansion of the ski area is located entirely in the Gifford Pinchot National Forest which is located in this district. Further, the majority of plaintiffs reside in this district. Venue is properly before the District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391(e) or § 1392.

## III. PARTIES

**8.**    Plaintiff Hogback Basin Preservation Association ("HBPA") is a non-profit organization organized under the laws of the State of Washington. HBPA is a membership organization of individuals who have lived, used, enjoyed, and valued the area of the proposed ski area expansion for many years. Members of appellant HBPA regularly use the Gifford Pinchot National Forest and Okanogan and Wenatchee National Forests for hiking, camping, backpacking, bird watching, cross-country skiing, downhill skiing, and biological study. In particular, members of appellant HBPA extensively use the Hogback Basin, the White Pass Ski Area, and the Goat Rocks Wilderness Area for recreation and other purposes.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

**9.** Plaintiff Sierra Club is a national conservation organization with 580,000 members including 25,000 in Washington State. Its principal place of business in Washington is the Cascade Chapter Office at 180 Nickerson Street, Suite 202, Seattle, WA 98109. Its national headquarters is at 85 Second Street, San Francisco, CA 94105. Sierra Club members use the Gifford Pinchot National Forest and the Okanogan and Wenatchee National Forests for many purposes including hiking, camping, cross-country skiing, downhill skiing, backpacking, fishing, bird watching, nature photography, horseback riding, and biological study. In particular, members of the Sierra Club use the Hogback Basin Area and Goats Rock Wilderness Area for recreational and other purposes. Sierra Club and its members have been actively involved in the planning process for the Hogback Basin Area and the proposed expansion of White Pass Ski Area. Sierra Club members will be materially and adversely affected by the proposed expansion of the White Pass Ski Area and activities and impacts inherent in this development.

**10.** The Record of Decision allowing expansion of the White Pass Ski Area approves the cutting of trees in an inventoried roadless area, the construction of a parking lot in another inventoried roadless area and other development activities that will significantly degrade the roadless and wilderness values currently enjoyed by plaintiffs and their members.

**11.** The decision approving the White Pass Ski Area expansion creates an actual and imminent invasion of plaintiffs' interests.

**12.** The decision approving expansion of the White Pass Ski Area, and its imminent harm to plaintiffs, is traceable directly to the actions of the federal defendant that approved the action.

---

COMPLAINT                                                    4                                    WESTERN ENVIRONMENTAL LAW CENTER
                                                                                                 1216 Lincoln Street
                                                                                                 Eugene, OR  97401
                                                                                                 (541) 485-2471

**13.**    Because defendant's actions approving the expansion violate several procedural and substantive laws, a favorable decision by this Court reversing the Record of Decision and rescinding the Final Environmental Impact Statement will redress the actual and imminent injury to the plaintiffs by eliminating the legal basis for the ski area expansion.

**14.**    Plaintiff organizations and their members submitted timely and substantive comments to the Forest Service during the NEPA process.

**15.**    Plaintiffs Hogback Basin Preservation Association and Sierra Club filed a timely administrative appeal with the Regional Forester as allowed by Forest Service regulations. This administrative appeal was denied. Plaintiffs have exhausted their administrative remedies and have no further adequate remedy at law.

**16.**    Defendant, United States Forest Service ("USFS"), is an agency of the United States Department of Agriculture. The USFS is responsible for the administration and management of the Gifford Pinchot National Forest and the Okanogan and Wenatchee National Forests, including implementation of NEPA, NFMA, the APA and the various laws and policies protecting the rights and interests of the plaintiffs in this matter.

**17.**    Defendant, White Pass Company ("Company"), is the concessionaire and operator of the White Pass Ski Area that is the subject of the ROD and FEIS at issue in this matter. Defendant USFS has authorized the Company to commence timber cutting and other ground-disturbing activity based on the ROD. As such, the Company has an interest relating to the subject of this litigation and is situated

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

such that the disposition of this matter may impair or impede the Company's ability to protect its interests in same.

## IV. OPERATIVE FACTS

18.     The White Pass Company operates the White Pass Ski Area at White Pass, Washington, under a special use permit with the U. S. Forest Service. The White Pass area is located in the northeast portion of the Gifford Pinchot National Forest and in the southwest portion of the Okanogan and Wenatchee National Forests. The ski area is located approximately 50 miles west of Yakima, Washington, 20 and 35 miles east of Packwood and Randall on U.S. Highway 12. The ski area is located both in Yakima and Lewis counties.

19.     With the exception of U.S. Highway 12 and the existing transportation support system for White Pass Village and Ski Area, the area remains roadless. The White Pass area is adjacent to the Goat Rocks Wilderness on the southern boundary and the William O. Douglas Wilderness on the northern boundary. The present boundaries of the White Pass Inventoried Roadless Area are entirely within the area analyzed by the Forest Service's NEPA review.

20.     Hogback Basin is one of the headwaters of the Clear Fork of the Cowlitz River. The Clear Fork of the Cowlitz River was designated a Tier 2 Key Watershed by the 1994 Northwest Forest Plan for the purpose of protecting high quality aquatic habitat and high quality water.

21.     In 1985, the White Pass Company began exploring the area surrounding its current operations for expansion. The company explored expanding into the 800-acre Hogback Basin. This area is currently designated as an Inventoried Roadless Area. These early explorations led to the preparation of

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

a Final Environmental Impact Statement and Record of Decision in July, 1990. That Record of Decision was subsequently withdrawn consequent to litigation based on concerns over threatened and endangered species, old growth habitat, air quality, historic, and American Indian religious values. In 1992, the White Pass Company withdrew their expansion permit application.

**22.**    From 1992 to 1998, the Forest Service and the White Pass Company continued to review the area around the existing ski area for expansion. In 1998, the White Pass Company again requested permission to expand its permitted operations into the 300 acre Hogback Basin area -- part of the larger Hogback Basin. The proposal before the Forest Service was to allow an expansion of ski runs, the construction of an additional chair lift, the construction of a mid-mountain day lodge, and construction of a road into an Inventoried Roadless Area. Again, the plan was challenged and this court found it to be unlawful.

**23.**    Since 2001, the Forest Service and the White Pass Company continued to review the area around the existing ski area for expansion. The White Pass Company has again requested permission to expand its operations into the Hogback Basin. The proposal before the Forest Service is to allow a 767-acre expansion adding 90 acres of ski-terrain on 18 new trails, the construction of two additional chair lifts, the construction of a mid-mountain day lodge in the Hogback Basin, as well as the cutting of 22 acres of trees and construction of a seven-acre parking lot road in Inventoried Roadless Areas.

**24.**    In December, 2004, the U.S. Forest Service issued a Draft Environmental Impact Statement and accepted public comments on the proposal.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

**25.**    In June, 2007, the U.S. Forest Service issued the FEIS for the proposed expansion of the White Pass Ski Area.

**26.**    On June 14, 2007, the Forest Supervisors for the Gifford Pinchot National Forest and Okanogan and Wenatchee National Forests issued a Record of Decision approving the expansion of the White Pass Ski Area as discussed in the FEIS. The Supervisors further approved Amendment No. 19 to the Gifford Pinchot National Forest Plan ("GPNFP") as part of the June 14, 2007 ROD. Amendment No. 19 amends the GPNFP's Riparian Area Standards and Guidelines such that it will allow construction of ski trails, chairlifts, buildings, utilities and associated infrastructure within an area less than 100 feet from the edges of lakes, streams, ponds, wet meadows, marshes and springs located in Riparian Areas.

**27.**    On August 31, 2007, plaintiffs filed an administrative appeal with the Regional Forester for the United States Forest Service Pacific Northwest Region.

**28.**    On September 18, 2007, plaintiffs met with defendant Forest Service and White Pass Company in an attempt to resolve this dispute.

**29.**    On October 19, 2007, plaintiffs' appeal was denied by the Appeal Deciding Officer with the Regional Forest Office.

**30.**    On plaintiffs' information and belief, White Pass Company has begun cutting timber under the authority granted by federal defendant's issuance of the ROD at issue herein.

**31.**    Plaintiffs have been required to expend costs and to obtain the services of separate law

firms, including attorneys, law clerks, and legal assistants to prosecute this action. Plaintiff HBPA is entitled to costs of disbursements and costs of litigation, including reasonable attorney and expert witness fees, as provided for under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).

## V. CAUSES OF ACTION

### A. First Cause of Action: Violation of the Roadless Area Conservation Rule.

**32.**     Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**33.**     Under the Roadless Area Conservation Rule ("Roadless Rule"), 36 CFR § 294.10 *et seq*. (2001), road building and timber cutting associated with ski development is allowed only within the existing boundaries of special use permit areas. Presumptively, roads cannot be built, and timber cutting cannot occur, in national forest roadless areas to expand ski areas unless such expansion has been approved prior to the publication of the Rule in the federal Register (January 12, 2001*). See, e.g.*, 66 FR 3244, 3260.

**34.**     Federal defendant acknowledges that "the 2001 [Roadless] Rule applies to management of the IRAs within and adjacent to the proposed expansion area." FEIS at 3-448.

**35.**     After the Roadless Rule was proposed, defendant White Pass Company sought to be exempted from its development restrictions. *Id*. After considering the request, the Forest Service refused to exempt White Pass Company from the Roadless Rule's development restrictions. *Id*.

**36.** The development activity proposed in this matter is dependent upon the cutting of at least 21.5 acres of timber in the White Pass IRA. *See, e.g.*, ROD at 37. Moreover, the development activity proposed in this matter adversely affects three inventoried roadless areas ("IRA"); the Goat Rocks IRA, the William O. Douglass IRA, and the White Pass IRA. Indeed, the impact of the proposed development on the White Pass IRA is so significant that it will result in the removal of 767 acres from the inventory of potential wilderness areas because it will no longer satisfy the criteria for inclusion. FEIS at 3-453-54. Additionally, a 7-acre parking lot and a 400-square foot ticket booth is to be developed in the Goat Rocks IRA.

**37.** None of the development activity proposed in this matter was authorized at the time of the Roadless Rule's publication of the Rule in the federal Register (January 12, 2001*)*. Accordingly, the timber cutting in the White Pass IRA and the parking lot construction in the Goat Rocks IRA are not permitted under the Roadless Rule.

**38.** Accordingly, the action of defendant USFS in approving the ROD which permits timber cutting in the White Pass IRA and the parking lot construction in the Goat Rocks IRA is arbitrary, capricious and not in accordance with law.

**B.    Second Cause of Action: NEPA - Failure to Adequately Consider the Cumulative Impacts of Reasonably Foreseeable Actions.**

**39.** Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**40.** NEPA and its implementing regulations require that actions with "cumulatively significant impacts" be considered in a single EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.25(a)(2). Cumu-

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

lative actions are actions whose impacts "result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

41.     The FEIS contains only two and a half pages that describe the cumulative effects on recreation (FEIS 3-406 – 409). This assessment displays two tables that describe in narrative form the effects on backcountry recreation in the Upper Clear Fork Cowlitz River and Upper Tieton River watersheds. National Forest lands cover approximately 543,000 within the entire Cowlitz River watershed and 514,000 acres within the Naches River watershed, which encompasses the Tieton River watershed. (Washington State Major Public Lands Acreages, Washington Department of Ecology, Olympia, WA, 2007, http://www.ecy.wa.gov/services/gis/maps/wria/mpl/mplacreage.htm). In comparison, the entire Gifford Pinchot National Forest is 1,312,000 acres, the Wenatchee National Forest is over 2.2 million acres, and the Mt. Baker-Snoqualmie NF is over 1.7 million acres. Recreational users in Washington generally consider the "southern Cascades" to extend from the Columbia River to Snoqualmie Pass, and on to Stevens Pass and/or Mission Ridge. Consequently, the appropriate area for cumulative impacts analysis encompasses the White Pass, Crystal Mountain, Summit at Snoqualmie (including Alpental), Stevens Pass and Mission Ridge developed ski areas. Accordingly, NEPA mandates that the scope of the cumulative impacts analysis of the "southern Cascades" must be construed to include the several million acres of federal public National Forest land contained in all of the developed ski areas from the Columbia River to Snoqualmie Pass, and on to Stevens Pass and/or Mission Ridge. In comparison, the FEIS cumulative effects analysis considers impacts only on the upper portions of watersheds that contain approximately a million acres of National Forest land and that contain no other developed ski areas.

**42.**     The discussion of cumulative effects in the FEIS, *see e.g.,* Table 3.11-5 and -6, has thus been unlawfully constrained to address only those impacts to backcountry recreation within the White Pass ski area or the adjacent Zig Zag Nordic and Snowshoe Trails, located across Highway 12 from the ski area, not the area from the Columbia River to Snoqualmie Pass, and on to Stevens Pass and/or Mission Ridge mandated by NEPA. The Forest Service's failure to disclose or analyze these cumulative environmental impacts violates NEPA.

**43.**     The Forest Service decision approving the ROD and upholding the FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental Policy Act and its implementing regulations.

## C.     Third Cause of Action: NEPA - Failure to Analyze All Reasonable Alternatives.

**44.**     Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**45.**     NEPA and its implementing regulations require that agencies "rigorously explore and objectively evaluate" all reasonable alternatives to the proposed action in the EIS. 42 U.S.C. § 4332(2)(C)-(iii); 40 C.F.R. § 1502.14(a). An EIS is rendered inadequate by the existence of a viable but unexamined alternative. *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815 (9th Cir. 1987), *rev'd on other grounds*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). Environmental review should focus on "reasonable alternatives to proposed actions that will avoid or minimize adverse effects." 40 C.F.R. 1500.2(e). Under NEPA, agencies are required to "study, develop, and de-

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

scribe appropriate alternatives to recommended courses of action in any proposal which involves unre-

solved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

46.    Forest Service directives recognize that permits for special (non-timber) uses must pro-

vide for a "real public service" and serve the "long-range public interest." Forest Service Manual 2710.2

and 2710.3 The FSM stresses the Forest Service's objective when issuing special permits is to advance

the agency's goals, not those of the proponent:

> A permit shall not be granted simply to provide a commercial profit-making opportunity.
> The Forest Service is not required to accommodate a desire of an individual applicant. A
> real public service or other justification must be evident… to show at least that the use
> meets a public need and will *not* conflict with national forest objectives, programs, or
> purposes.

FSM 2710.3 (emphasis added).

47.    The range of alternatives considered in the FEIS is fundamentally inadequate because it

contains four alternatives for downhill skiing and no alternatives for the development of cross-country

facilities in the Pigtail and Hogback basins. Nordic ski development would present significantly fewer

adverse impacts on the environmental resources present in the Pigtail and Hogback basins. Numerous

comment letters requested that the Forest Service present a Nordic ski development, but such an alterna-

tive is absent from the FEIS.

48.    Further, the FEIS fails to consider any alternatives involving the development of winter

sports facilities at other locations within the applicable market area. The FEIS acknowledges that there

are a number of other existing ski areas within the market area, *i.e.* Crystal Mountain, Mission Ridge,

Stevens Pass, and the Summit at Snoqualmie Pass.

49.    NEPA requires the Forest Service to consider the development of alternative winter sports sites in this FEIS at issue herein — not in some future environmental document. *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d at 815 ("it should have appeared obvious that investigation was warranted to determine whether the development of winter sport opportunities could be pursued at alternative sites."). Here, federal defendant should have specifically identified the market and geographic pool of skiers targeted and then considered alternative ski development within that market area. *Id*. at 816.

50.    However, the FEIS provides no meaningful consideration of the development of alternative sites or how well such development may fulfill the needs of the public within the market area. This approach is contrary to NEPA and the Forest Service's own policies and regulations because it limits the choice of alternatives to those that would further the profit-making objectives for the White Pass Company, without regard to the overall public interest for winter sports facilities within the entire market area, not just at White Pass. The Forest Service is simply providing a commercial profit-making opportunity for this proponent without any real analysis of public service and need within this entire market area as required by the Forest Service manual. Consequently, the FEIS violates NEPA's fundamental requirement that an adequate range of reasonable alternatives be considered.

51.    The FEIS fails to address the option of Nordic skiing development in the Pigtail and Hogback basins. Similarly, the FEIS does not address the potential to satisfy the any public desire for Alpine skiing facilities at cites other than at White Pass. The federal defendant instead unlawfully limited its range of contemplated options to those which focus primarily on the profit-making objectives of the White Pass Company. The Forest Service's failure to analyze any alternatives for Nordic skiing in

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

the Pigtail and Hogback basins and its exclusive focus on new development occurring at the White Pass site violates NEPA.

52.    The Forest Service decision approving the ROD and upholding the FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental Policy Act and its implementing regulations.

**D.    Fourth Cause of Action: NEPA – Failure to Consider Environmental Impacts of Electrical Utility Upgrades for the Proposed Expansion.**

53.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

54.    The FEIS fails to adequately discuss the ramifications of upgraded electrical power delivery to the White Pass ski area to meet the demands of the proposed expansion. The FEIS acknowledges that the power capacity of the existing line is not capable of delivering power needed for the proposed expansion. FEIS at 3-429, 2-32, and 2-40. The Forest Service selected Alternative (Modified 4) will require an upgrade of the power line from a capacity of 1550kW to 4000kW, an increase of over 150%. FEIS at 3-429, 2-32, and 2-40.

55.    A DEIS comment letter from the Benton Rural Electric Association ("BREA") — the utility that provides electrical power to the White Pass ski area — to the Forest Service, dated February 1, 2005, stated:

> Expansion will require the rebuilding of the power line into the area. *It will also require that the power system reliability be improved by widening the right of way, and the removal of danger trees.* Danger trees are defined by the United States Department of Agri-

culture as trees which when falling would reach within 5 feet of a point underneath the outside conductor.

*See*, Exhibit D, attached to plaintiffs' administrative appeal (emphasis added).

56.    When it considered the Benton Rural Electric Association's comments, the Agency simply omitted citation to the passage quoted above. *See, e.g.*, Response to Comments, FEIS Vol. III at RTC-152.

57.    Furthermore, there is no discussion in the FEIS of fire and electrocution hazard of an upgraded power corridor nor of forest fires, loss of life and property, as a result of a unsafe power corridor lined with "danger trees". A Seattle Post-Intelligencer article dated, August 22, 2007, entitled "State sues Okanogan utility over wildfire cost" details a 2005 wildfire caused by a danger tree falling on a utility corridor power line that burned over 1,000 acres, destroyed a sawmill, threatened homes and life, and cost $161,000 in fire fighting costs. Exhibit F, attached to plaintiffs' administrative appeal.

58.    The FEIS does not directly address the BREA's indication that the utility corridor will need to be widened and "danger trees" cut nor does it address the risk and liability potential associated with failure to properly maintain adequate clearances in the utility corridor. Instead, federal defendant summarily concludes, without reference to any evidence, that "[b]ased on recent experience, it appears to be technically feasible to utilize the existing powerline corridor with upgraded conductors and utility poles." FEIS at 3-429.

59.    The Forest Service decision approving the ROD and upholding the FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

Policy Act and its implementing regulations.

### E.    Fifth Cause of Action: NEPA – Failure to Adequately Address Sewage Issues.

**60.**    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**61.**    There is a documented history of ongoing sewage problems, failing drain fields, and incidents of surfacing sewage at White Pass Ski Area for the past 40 years. The White Pass Company has been cited for violation of public health laws and the Forest Service Special Use Permit on a number of occasions during the last 40 years. The Forest Service has been aware of the serious sewage problems at White Pass Ski Area. The following quotations were excerpted from Forest Service documents dated from the 1960's up to the present:

> "The drainfield area needs repairs. The draining tank is still not put together. There are two separate areas where effluent is pouring over the ground and forming large pools at the lower side of the drainfield area. We can not tolerate this any longer. You stated late last fall that this would be taken care of this spring 1968. Now it is September 11, 1968 and the system is still not working." Exhibit I, attached to plaintiffs' administrative appeal (FS demand letter to White Pass Corp. dated 9/11/68).

> "The existing large drainfield which serves the [White Pass Corp.] facilities north of the highway has failed. The failure consists of surfacing effluent in approximately 5-7 separate locations. . . This condition was noted last fall. At that time, the permittee was to have rectified the problem." Exhibit J, attached to plaintiffs' administrative appeal (FS memo dated 10/22/68).

> "The drain field for the day lodge at White Pass is failing and the effluent is being discharged into a ditch adjacent to the highway." Exhibit K, attached to plaintiffs' administrative appeal (FS memo dated 11/23/70).

> "It has come to the attention of this office that the sewage disposal system serving the Lodge and Restaurant at White Pass is failing." Exhibit L, attached to plaintiffs' administrative appeal (Lewis Cty. Health Dist. demand lttr. to White Pass Corp. dated 4/28/81).

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

"To date, no real proposal for a solution to the seasonal overflow problem has been presented [by White Pass Corp.] . . . As usual, White Pass is not amenable to expending funds for a long term correction of the sewage system." Exhibit M, attached to plaintiffs' administrative appeal (Lewis Cty. Health Dist. lttr. to FS seeking assistance with continuing drainfield failure. dated 7/6/81).

"The existing [septic] tank volume is 10,860 gallons, far short of the needed capacity." Exhibit N, attached to plaintiffs' administrative appeal, at 2 (Lttr. from White Pass Corp. engineers to FS describing failings of septic system at that time, dated 7/6/84).

"[T]his office was made aware of the problem which you are having with [your] drainfield. The problem is surfacing sewage, which according to you, occurs primarily during peak usage times. . . . surfacing sewage . . . is considered to be a public health hazard. If the problem remains uncorrected, the Health Department may be forced to order all buildings utilizing the system to be vacated." Exhibit O, attached to plaintiffs' administrative appeal (Demand lttr. from Yakima Health Dist. to White Pass Corp. dated 8/1/89).

"[You have a ]failing drain field with surfacing sewage. . . [*I]f sewage is surfacing at any time after October 15, 1990, it will force the Health District into an enforcement mode.* Since the transient population at the facilities is so great, the chances for disease transmission are very high. The Health District can no longer allow this public health hazard to continue. " Exhibit P, attached to plaintiffs' administrative appeal (Demand lttr. from Yakima Health Dist. to White Pass Corp. dated 9/4/90 (emphasis in original)).

"[There are] ongoing White Pass sewage problems. [Their] sewage system has been failing for at least the past five years, according to White Pass officials. . . . Yakima Health District's position is that the White Pass sewage problem must be fixed without delay." Exhibit Q, attached to plaintiffs' administrative appeal (Lttr. from Yakima Health Dist. to Wash. Dept. of Ecology dated 9/14/90).

"The Forest Service has a long documented history of failing septic systems on White Pass, and Forest Service staff were aware of the Condo complex's failing sewage systems in July 1989. The [1990 White Pass expansion] FEIS does not discuss these issues. . . . Surfacing sewage, especially that coming from such a diverse transient population, is unacceptable from a public health perspective at any time. Exhibit R, attached to plaintiffs' administrative appeal, at 2 (Lttr. from Yakima Health Dist. to FS re. White Pass septic field problems and flaws in EIS, dated 9/20/90).

"Chris Coffin was working for the Yakima Health District in 1993 and investigated a report of discharge of sewage into Leech Lake, and confirmed there was a problem." 2/23/2005. Exhibit H, attached to plaintiffs' administrative appeal, at 2.

"There is no record of a permit and its unlikely that system meets modern code or would be considered adequate to accept any additional flows" 2/23/2005. *Id.* at 1.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

62.     Despite the documented history of sewage problems at White Pass Ski Area, there is no discussion of it in the FEIS. Furthermore, the FEIS relies on [fecal E. coli] measurements in Leech Lake that are over 18 years old. FEIS pg 3-71. In addition, no water samples have ever been taken during ski season when the sewage system is running at normal capacity. FEIS Table 3.3-8. As noted above, this site historically manifests septic field problems primarily during the ski season. *See. e.g.,* Exhibit O, attached to plaintiffs' administrative appeal ("The problem is surfacing sewage, which according to you, occurs primarily during peak usage time.").

63.     The U.S. Environmental Protection Agency ("EPA") stated in a comment letter dated February 18, 2005:

> The water quality data in table 3.3-8 includes ortho-phosphorus levels that appear to be elevated and dissolved oxygen levels that appear to be lower than what would be expected for the recorded water temperatures.

Exhibit G, attached to plaintiffs' administrative appeal, at 5. Although the EPA requested the FEIS explain this discrepancy, no discussion was provided in the FEIS.

64.     The Washington Department of Ecology ("Ecology") wrote in a comment letter dated February 20, 2005:

> The size of the systems are such that they should be covered by State wastewater discharge permits from Ecology.- Ecology has never issued a permit for either facility. . . The chemical analysis of Leech Lake included in table 3.3-8 are old (1990) and are indicative of a lake of a relatively high trophic status (high phosphorus, dissolved oxygen below saturation). The abundance of emergent plants and the epiphytic algae growing on them in recent years are consistent with an elevated trophic status, especially in comparison to Deer and Sand Lake a mile or so to the north in a similar setting (except for the human activity adjacent to Leech Lake).

FEIS Volume 3. Ecology continued:

> Leech Lake appears to have an elevated trophic status as a result of the developments around White Pass, including failed wastewater systems. The trophic status of Leech Lake needs to be reviewed in the context of the "natural" conditions and the impact of the

COMPLAINT                                    19                    WESTERN ENVIRONMENTAL LAW CENTER
                                                                                1216 Lincoln Street
                                                                                Eugene, OR  97401
                                                                                (541) 485-2471

development assessed. A more complete assessment of the wastewater systems needs to be completed, what permits have been issued for the wastewater systems? Why haven't the agreed upon repairs been completed? What is the impact of not completing the repairs? Septic systems are best suited to steady usage, the variation in flows during cold weather (and with long lines to the drain fields) and the extreme variation through the year are likely to result in degraded performance. An assessment of the performance of both septic systems is needed since the drainfield [is?] adjacent to streams of the highest water quality classification in Washington State.

*Id*. at 3.

**65.**     The FEIS fails to adequately discuss the ongoing sewage problems at White Pass and how they impact the surrounding waters as required by NEPA.

**66.**     The Forest Service decision approving the ROD and upholding the FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental Policy Act and its implementing regulations.

**F.     Sixth Cause of Action: NEPA — Failure to Adequately Address Climate Change Impacts**.

**67.**     Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**68.**     Warming of the climate system is unequivocal, as is now evident from observed increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global mean sea level. *See, e.g*., Richard Alley, Terje Berntsen, Nathaniel Bindoff *et al.*, "Summary for Policymakers: A Report of Working Group I of the Intergovernmental Panel on Climate Change" at 5. Exhibit U, attached to plaintiffs' administrative appeal.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

69.    The warming rate for the Pacific Northwest over the next century is projected to be in the range of .1-.6°C/ decade. Climate records show that the Northwest (regionally averaged) has warmed about 1.0 °C since 1900, or about 50% more than the global average warming over the same period. Regularly collected measurements indicate that Northwest springtime snow pack from the western Rockies to the coast, and from the central Sierras in California to southern British Columbia, declined substantially between 1950 and 1997 in part due to a reduction in precipitation and in part due to rising winter temperatures during this period. These measurements indicate that for many individual recording sites decreases in this period were up to 60% in April 1st snow pack for the "warmest" locations in the Northwest – areas including the lower elevations of the Cascades and the Olympic mountains in Washington. *See, e.g.*, Robert Bilby, Susan Hanna, Michael Healey *et al.*, "Independent Scientific Advisory Board: Climate Change Impacts on Columbia River Basin Fish and Wildlife" at 12. Exhibit V, attached to plaintiffs' administrative appeal.

70.    Changes have already been observed in many species' ranges that are consistent with changes in climate. The changes include poleward and elevationally upward movements of many insects, birds, trees and forbs. *See, e.g.*, Neil Adger, Pramod Aggarwal, Shardul Agrawala *et al.*, "Summary for Policymakers: Climate Change 2007: Impacts, Adaptation, and Vulnerability" at 2. Exhibit W, attached to plaintiffs' administrative appeal. Future climate change may lead to fragmentation of suitable habitats that may inhibit adjustment of plants and wildlife to climate change through range shifts. "Independent Scientific Advisory Board: Climate Change Impacts on Columbia River Basin Fish and Wildlife," *supra* at iii. Locations that are likely to be sensitive to climate change and have high ecological value are sites where establishing adequate protective measures, including reserve areas, will be a key component of any effort to address changing climate. *Id*. at vii.

**71.**    In the western United States, steep environmental gradients (for instance, in topography, elevation, and water availability) mean that there will be relatively few areas where a species' potential range does not shift significantly under future climate scenarios. The steep environmental gradients also mean that movement corridors, which would facilitate the migration of plants and animals to more suitable areas as climate changes, may be limited and should be given particular consideration in planning to mitigate for climate change. Many assessments of likely ecological responses to climate change conclude that several community types that are significant in the Columbia River Basin are likely to decrease greatly in the area or disappear from the region. These include alpine habitats, subalpine spruce-fir forests of the type present in the White Pass area. *Id.* at 24.

**72.**    NEPA requires that prior to agency decision-making, the agency must review and prepare an adequate EIS.

**73.**    The Forest Service did not adequately assess the impact of climate change on the proposed project area and the project itself. Climate change is likely to affect sensitive species that currently utilize habitat in the proposed expansion area, including wolverine. Because alpine and subalpine habitats will shrink due to climate change, areas that currently support these types of habitat are very significant to the protection of wildlife and other species that depend on these habitats.

**74.**    The Forest Service also failed to adequately assess the impact of climate change on the Hogback Roadless Area's hydrology. Climate change will result in changes in temperature and precipitation that will alter snow pack, stream flow and water quality:

    **A**.  Warmer temperatures will result in more precipitation falling as rain rather than snow,
    **B**.  Snow pack will diminish,
    **C.**  Stream flow timing will be altered and peak river flows will likely increase, and

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

**D**. Water temperatures will continue to rise.

"Independent Scientific Advisory Board: Climate Change Impacts on Columbia River Basin Fish and Wildlife," *supra* at iii; "Summary for Policymakers: Climate Change 2007: Impacts, Adaptation, and Vulnerability" at 2,5,10. Exhibit W, attached to plaintiffs' administrative appeal. These changes will directly impact the viability of a ski resort in the area, including its economic viability) and should be considered in any analysis of expansion. Trading the protection of sensitive species for ski area expansion in an area likely to be heavily influenced by climate change isn't a wise use of public lands.

75.    The Forest Service's decision to approve the ROD based on an inadequate FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental Policy Act and its implementing regulations.

**G.    Seventh Cause of Action: NEPA – Violation of Requirement to Adequately Address the Purpose and Need and Pubic Interest for the Expansion Proposal.**

76.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

77.     NEPA requires that prior to agency decision-making, the agency must review and prepare an adequate FEIS.

78.    The Forest Service's ROD was based on an inadequate FEIS. The FEIS discussion was inadequate with respect to numerous significant environmental and other concerns. The FEIS failed to analyze, or failed to adequately analyze the appropriate purpose and need and economic rationale for the proposed expansion.

COMPLAINT                                    23                  WESTERN ENVIRONMENTAL LAW CENTER
                                                                1216 Lincoln Street
                                                                Eugene, OR  97401
                                                                (541) 485-2471

79.    The FEIS failed also to adequately address whether the ski area expansion permit was in the public interest.

80.    The Forest Service's decision to approve a ROD based on an inadequate FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental Policy Act and its implementing regulations.

**H.    Eighth Cause of Action: NFMA – Violation of National Forest Plan Visual Resource Management Standards.**

81.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

82.    The NFMA requires all forest uses to be "consistent with the Land Management Plans." 16 U.S.C. § 1604(i). NFMA regulations require Forest Plans to contain Visual Quality Objectives (VQOs) for forest planned use zones and Visual Management System ("VMS"). Because NFMA regulations require plans to include VQOs, the VQOs impose legal limits on the use of National Forest lands. The Scenery Management System (SMS) was developed in 1995 to eventually replace the VMS.

83.    The FEIS states:

At the time of this FEIS, neither the Gifford Pinchot nor the Wenatchee National Forest Land and Resource Management Plans have been updated. For this FEIS, both the VMS and SMS will be used to describe the existing landscape and evaluate the range of alternatives' effects on the landscape, as initially directed by the Chief of the USFS and subsequent direction (USDA 1995,1996,1997b,1998e).

FEIS 3-459.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

**84.**    As alleged below, federal defendant has violated NFMA regarding its implementation of both the VMS and SMS.

### THE EXPANSION DIRECTLY CONTRADICTS VMS.

**85.**    The Forest Service has assigned a "retention" VQO of the entire area of the proposed White Pass Ski Area expansion. The Wenatchee National Forests Plan defines a "retention" VQO as an "area in which changes to the landscape are not visually evident to the average person unless pointed out. They appear to be natural." WNFP at II-II. The GPNFP glossary defines a "retention" VQO as "management activities should not be evident to the casual forest visitor."

**86.**    The Wenatchee National Forest Plan further states on page IV-65, "visual quality objectives shown represent minimums, higher ones may be achieved." The GPNF Plan further states that the: "Visual Quality Objectives assigned in each Management Area should be the minimum level acceptable and should be met by all activities." GPNF IV-48.

**87.**    The construction of chair lifts, lift terminals, towers, ski runs, a parking lot, and lodge facilities will be evident to any person on the Pacific Crest National Scenic Trail or in the White Pass Area. These developments will not appear to be natural. The proposed expansion will violate the Visual Quality Objective of Retention established by the Forest Service and the FEIS acknowledges this:

> Increased development in Pigtail and Hogback basins under Alternative 2, Modified alternative 4, and Alternative 6, would result in a more developed character of the Hogback Basin, with a VQO of retention[.] . . Visual impacts would be irretrievable for the life of White Pass operations…

FEIS 3.17.3.6 and 3.17.4.6.

88.    The decision approving the ROD violates the VQOs for both the Okanogan and We-natchee and Gifford Pinchot National Forests and therefore NFMA and its implementing regulations. The ROD is contrary to law.

### THE EXPANSION DIRECTLY CONTRADICTS SMS.

89.    The Scenery Management System ("SMS") terminology differs from the VMS. The SMS pertains primarily to the social/cultural dimension of ecosystem management, but also has links to the biological and physical. The SMS uses four distance zones to describe the part of a characteristic land-scape that is being inventoried. These consist of immediate foreground, foreground, middle ground and background. FEIS 3-459 ("Key elements and two of the most important aspects of the new SMS process are 'sense of place' and 'Special Places.'").

90.    Federal defendant has established that "Special Places are important primarily as destina-tions. They occur at different scales of the ecosystem ranging from an entire national forest or ranger district to a more localized area to a very specific site that may encompass only a few acres." FEIS 3-459. "The SMS measures the degree of "intactness" and "wholeness" of the landscape with "scenic in-tegrity." FEIS 3-459.

91.    The Hogback Basin "sense of place" is described in FEIS as:

        1. Roaded natural
        2. Unique Vegetative Community
        3. Outstanding Destination for Regional Backcountry Skiing.
FEIS Table 3.15-1.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

92.     The Scenic Integrity Level of the proposed expansion area as shown in FEIS Table 3.15-2 is "High" with the "Perception [of the] Degree of Deviation" as "Not Evident" and the area "Appears Unaltered."

93.     The proposed development of the Hogback and Pigtail Basin will dramatically alter the Scenic Integrity and its unique "Sense of Place" from all four viewpoints and therefore contradicts the Scenery Management System directives. The Record of Decision is contrary to law.

94.     The Forest Service's action regarding the VMS and SMS in this matter violates "sense of place" and "Special Places" mandates established by the Wenatchee and Gifford Pinchot National Forests Plans and therefore NFMA and its implementing regulations. The ROD is contrary to law.

95.     The Forest Service decision approving the ROD and upholding the FEIS is arbitrary and capricious, an abuse of discretion, not in accordance with law, and violates the NFMA and its implementing regulations.

I.      **Ninth Cause of Action: Violation of NFMA, Aquatic Conservation Strategies, and Gifford Pinchot National Forest Plan's Prohibitions on Development Adjacent to Aquatic Resources.**

96.     Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

97.     The National Forest Management Act requires that all forest uses be "consistent with land management plans." 16 U.S.C. § 1604(i).

COMPLAINT                                    27

98.     In 1994, the U.S. Forest Service issued the Forest Service and Bureau of Land Management planning documents within the range of the Northern Spotted Owl, what is commonly known as the Northwest Forest Plan ("NWFP"). *See* 59 Fed. Reg. 18788 (April 20, 1994); *Seattle Audubon Society v. Lyons*, 871 F. Supp. 1291, 1322 (W.D. Wash. 1994), *aff'd* 80 F. 3d 1401 (9th Cir. 1996). The Northwest Forest Plan provides direction for management of habitat for late-successional and old-growth forest species on Forest Service and Bureau of Land Management lands in the Pacific Northwest in a manner that provides for the species' long-term health. The Northwest Forest Plan amended and was incorporated into the planning documents of nineteen National Forests and seven Bureau of Land Management districts within the range of the northern spotted owl, including western Oregon, western Washington, and northwestern California. The core components of the Northwest Forest Plan include a network of protected habitat areas, including: congressionally protected areas such as wilderness and wild and scenic rivers, late-successional reserves and riparian reserves, key watersheds; an aquatic conservation strategy, and a series of standards and guidelines that guide management actions, including requirements to survey and protect habitat for certain rare and uncommon species. Those standards and guidelines are described and contained in the Record of Decision and attached Appendix A: *Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl* ("Northwest Forest Plan ROD") signed by the Secretaries of Agriculture and Interior in April 1994.

99.     The NWFP is a "land management plan" as defined by NFMA. Accordingly, all forest uses must be consistent with the NWFP. 16 U.S.C. § 1604(i).

100.     One of the fundamental goals of the NWFP is achieving the objectives of the Aquatic Conservation Strategies ("ACS"). The ACS is intended to "restore and maintain the ecological health of

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

watersheds and aquatic ecosystems contained with them on public lands." The ACS, through the NWFP, requires agencies to manage riparian-dependent resources in order to maintain existing conditions or to implement actions to restore irreparable aquatic conditions. The NWFP establishes widths for Riparian Reserves, in which riparian resources receive primary emphasis, and to which special guidelines apply. Changes to these widths must be scientifically based and fully documented.

101.    The NWFP's Standards and Guidelines ("NWFP S&G") emphasize an agency's affirmative duty to protect the status quo of the riparian system: "Complying with the Aquatic Conservation Strategy objectives means that an agency must manage the riparian-dependent resources to maintain the existing condition or implement actions to restore conditions." NWFP S&G B-10. Moreover, "Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not "meet" the intent of the Aquatic Conservation Strategy and thus, should not be implemented." *Id.* "Standards and guidelines prohibit and regulate activities in Riparian Reserves that retard or prevent attainment of the Aquatic Conservation Strategy objectives." *Id.* at B-12. "Under the Aquatic Conservation Strategy, Riparian Reserves are used to maintain and restore riparian structures and functions of intermittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance habitat conservation for organisms that are dependent on the transition zones between upslope and riparian areas, improve travel and dispersal corridors for many terrestrial animals and plants, and provide for greater connectivity of the watershed." *Id.* at B-13.

102.    The NWFP gives "highest priority" to protecting the few remaining, high quality roadless areas in Key Watersheds. *Id.* at B-9.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

**103.**    [delete spacing]The Gifford Pinchot National Forest Plan ("GPNFP") prohibits newly developed recreation sites from expanding within the riparian influence area of aquatic resources. The GPNFP further requires that new recreation sites be setback at least 100 feet from the edges of lakes, streams, ponds, wetlands, meadows, marshes, and springs. Because the NWFP establishes minimum standards, the GPNFP setbacks apply only where the NWFP would otherwise allow development within 100 feet of aquatic sites.

**104.**    FEIS Figure 2-5 and Figure 3-25 clearly illustrate how Riparian Reserves, Riparian Influence Areas, wetlands, streams and ponds are specifically targeted for maximum development. The focus of development for the proposed expansion is almost entirely within Riparian Reserves of the Pigtail and Hogback Basins. FEIS Figure 3-25. These two "water basins" form the entire Tier 2 Key Watershed drainage in the proposed project area:

> **A**. The entire Basin Chair 6 including the lower and upper lift terminals, lift towers, associated cleared ski runs, and ditched utility corridors is located in Riparian Reserves.
>
> **B**. The entire mid-mountain lodge with associated drain field, and ditched utility corridors is located in Riparian Reserves.
>
> **C**. The Hogback Express Chair 7 lower terminal, most of its associated lift towers, cleared ski runs and ditched utility corridors are located in Riparian Reserves.

**105.**    The 767 acre expansion area is located within the White Pass Inventoried Roadless Area. In addition, the expansion area is within an ACS Tier II Key Watershed. Ski facilities are to be constructed and operated within 100 feet of aquatic sites.

**106.**    Federal Defendant admits that the project "would result in an increase of solar exposure reaching streams and wetlands, stemming from the loss of vegetation. Additionally, all Action alterna-

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

tives would increase the number of stream crossings, and increase the amount of potentially unstable stream banks." FEIS 3-498 ("Unavoidable Adverse Impacts" § 3.17.3). Over 25 acres in Riparian Reserves will be directly impacted by the proposed action. Table 3.3-14.

107.    Because the proposed construction and development in the White Pass IRA and the Key Watershed is directly contrary to the 1994 NWFP and the GPNFP, federal defendant's approval of the ROD directly violates the National Forest Management Act and is thus contrary to law.

J.    **Tenth Cause of Action: Violation of the ACS for Watershed Restoration.**

108.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

109.    The waters draining the Hogback Basin meet State of Washington Class AA (exceptional) standards. FEIS 3-68. This is the highest standard obtainable. "The White Pass Analysis area is a source of exceptional quality waters providing beneficial uses for residents, fish, [and] wildlife in both Eastern and Western Washington." 1998 FEIS 192. By degrading the water quality and adversely affecting riparian dependent species, the proposed action will not maintain the existing condition or lead to improved conditions and thereby violates the ACS and its watershed restoration element.

110.    Because the proposed construction and development in the White Pass IRA and the Key Watershed is directly contrary to the 1994 NWFP and the ACS for watershed restoration, federal defendant's approval of the ROD directly violates the National Forest Management Act and is thus contrary to law.

**K.    Eleventh Cause of Action: The Watershed Analysis is Fundamentally Flawed Because the Riparian Influence Areas are Incorrectly Invoked and Calculated.**

**111.**    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**112.**    The NWFP's standards and guidelines supersede direction in Long Range Management Plans ("LRMPs") unless the LRMP direction "is more restrictive or provides greater benefits to late-successional forest related species." NWFP S&G A-6. The Northwest Forest Plan states that Watershed Analysis is the appropriate place to determine correct Riparian Reserve boundaries. Watershed Analysis has been completed for both watersheds contained within the proposed expansion boundaries, and these analyses' adopted the Riparian Reserve widths recommended by the NWFP.

**113.**    However, the FEIS Watershed analysis relies on a narrower measure than the full Riparian Reserve boundaries; "the [Riparian Influence Area ("RIA"] boundaries for analysis of riparian functions." FEIS 3-59. "The RIAs are used to analyze particular riparian functions that occur only at that scale. These riparian functions include sediment filtration, stream bank stability, floodwater storage, LWD input to streams, stream channel shade, and stabilizing stream banks via root structure." *Id.*

**114.**    Moreover, the FEIS erroneously eliminates wetland and pond RIAs in the project area. Even though there are numerous wetland areas depicted in the project area, none have a corresponding RIA. FEIS Figure 3-29 and Figure 3-20. The FEIS acknowledges on page 3-58 "the RIA for wetlands was not evaluated because the required 300 foot buffer on the 114 mapped wetlands within the White Pass study Area does not provide a riparian associated measure from which to gain information concern-

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

ing impacts to actual riparian zones. That is, including the 300 foot buffer analysis for wetland RIAs would duplicate the analysis performed for Riparian Reserves." FEIS 3-58.

115.    The default width of Riparian Influence Area around a wetland less than one acre, of which is the case of most if not all of the wetlands in the White Pass project area, is twice the default width required for Riparian Reserves. FEIS Table 3.3. Therefore the acreage affected by the development is not the same as depicted in the Riparian Reserve, but in fact is much larger. It clear in FEIS Figure 3-29 how the RIAs associated with wetlands and ponds are dramatically impacted by the proposed development especially at the base terminal of Chair 6, the mid-mountain lodge, and the grading of Holiday Run when the correct buffer widths are implemented. This is a serious flaw of the Watershed Analysis considering the whole project is dependent on Amendment 19, which, if approved, would allow extensive development within these currently protected RIAs.

116.    Because the federal defendant's Watershed Analysis improperly substituted RIAs for Riparian Reserves to provide a narrower scope of protection and because, further, federal defendant incorrectly calculated the RIAs, the ROD is directly contrary to the 1994 NWFP and the National Forest Management Act and is thus contrary to law.

### L.    Twelfth Cause of Action: Violation of Forest Service Regulations for Amending Forest Plans.

117.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

**118.** Forest Service regulations require implementation of a vigorous process, including special notice and comment requirements for "significant" amendments to National Forest Plans.

**119.** Amendment 19 significantly alters the multiple use goals and objectives for long-term land and resource management by allowing construction and commercial development activities in riparian areas across 1,572 acres covered by the Special Use Permit at issue, including inventoried roadless areas and within a Key Watershed. The construction and operation of the ski runs, lodge and chair lift facilities, will result in material changes to — and limitation of — multiple use management options previously applicable to the affected areas. The impacts of development in the targeted riparian areas will directly and irreversibly undermine the management options established by the NWFP's Aquatic Conservation Strategy. Therefore, Amendment 19 directly contradicts the Aquatic Conservation Strategies for Key Watersheds in the 1994 Northwest Forest Plan.

**120.** Piecemeal amendments at the local level, such as Amendment 19 to the GPNFP, will have important effects on the entire NWFP and will significantly alter the long-term relationship between the levels of multiple use goals and the services originally protected by irretrievably removing the highest quality habitat in the key watershed system. Therefore, the proposed amendment is a "significant amendment" and must follow the same procedures that are required for developing and approving the NWFP.

**121.** The decision of approving Amendment 19 to the GPNFP violates Forest Service regulations implementing the NFMA and is contrary to law.

COMPLAINT                                    34

**M.     Thirteenth Cause of Action: Amendment 19 of the GPNPF Contradicts the NWFP's Prohibition of Timber Cutting in Riparian Reserves.**

122.    Plaintiffs hereby incorporate by this reference the allegations presented in all preceding paragraphs.

123.    The entire 767-acre expansion area is within the White Pass Inventoried Roadless Area, and is in an Aquatic Conservation Strategy Tier 2 Key Watershed. FEIS at 1-2 and 1-23. In addition, the project area includes numerous intermittent streams, wetlands and ponds with overlapping Riparian Reserves. FEIS Figure 3-25. The Record of Decision for the "Northwest Forest Plan" places "highest priority" to protect these remaining high quality Key Watersheds by prohibiting timber harvest in Riparian Reserves. NWFP C-31.

124.    Amendment 19 to the GNFP allows for 17 acres of "full clearing" and over 7 acres of "tree removal" within Riparian Reserves for construction of "ski trails, chairlifts, buildings, utilities and associated infrastructure." FEIS 1-12 , 2-17, Tables 2.3.1-2 and 2.3.4-3, and Figure 3-25. The FEIS admits that one of the unavoidable adverse affects of the proposal would be "clearing in forest stands with old-growth characteristics." FEIS 3-499.

125.    The decision of approving Amendment 19 to the GPNFP violates NWFP, NFMA and Forest Service regulations implementing same and is contrary to law.

/ / /

/ / /

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

# VI. PRAYER FOR RELIEF

**WHEREFORE, plaintiffs respectfully request that this Court:**

**A.**     Order the Forest Service to comply with the requirements of NEPA, NFMA, the APA and the other federal laws and regulations noted above, and until defendants do so, issue, as necessary and as specifically requested by plaintiffs, temporary restraining orders, and preliminary and permanent injunctions restraining defendants from approving, authorizing, or implementing any action related to the proposed expansion of the White Pass Ski Area, including actions irretrievably altering the status quo or depriving this court of jurisdiction .

**B.**     Order and declare that the ROD and FEIS are inadequate and violate NEPA and the APA.

**C.**     Order and declare that the ROD violates NFMA and the APA, and implementing Forest Service regulations.

**D.**     Award plaintiff HBPA their reasonable fees, costs, expenses, and disbursements associated with this litigation.

**E.**     Grant plaintiffs such additional and further relief as the Court may deem just and proper.


Dated, this 30th day of November, 2007.

Respectfully submitted,


  /s/David Bahr                                                 /s/ Stephen Tan
David Bahr, OSB No. 90199                    Stephen Tan, WSBA No. 22756
Western Environmental Law Center          Cascadia Law Group, PLLC
HBPA's Trial Counsel                              Sierra Club's Counsel
(*Pro Hac Vice* application pending)


  /s/Richard A. Poulin
Richard A. Poulin, WSBA No. 27782
SCOPE Law Firm, PLLC
HBPA's Local Counsel