David A. Bahr (OSB No. 90199)
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471 Voice
(541) 485-2457 Fax
bahr@westernlaw.org
HBPA's Trial Counsel

Richard A. Poulin (WSBA No. 27782)
SCOPE Law Firm, PLLC
P.O. Box 22091
Seattle, WA 98122-0091
(206) 420-1590 Voice
(206) 420-2545 Fax
rickp@scopelaw.com
HBPA's Local Counsel

Stephen Tan, (WSBA No. 22756)
Cascadia Law Group, PLLC
1201 Third Avenue
Suite 320
Seattle, WA 98101
(206) 292-2657 Voice
(206) 292-6300 Fax
stan@cascadialaw.com
Sierra Club's Counsel

HONORABLE JUDGE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HOGBACK BASIN PRESERVATION ASSOCIATION, and SIERRA CLUB, | Case No. CV-07-1913JLR |
| Plaintiffs, | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| vs. | Oral Argument Requested |
| UNITED STATES FOREST SERVICE, and WHITE PASS COMPANY, | Note on Motion Calendar: May 16, 2008 |
| Defendants. | |

/ / /

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

# I.  INTRODUCTION.

This is an action for declaratory and injunctive relief challenging the Record of Decision (ROD) and the Final Environmental Impact Statement (FEIS) issued by the United States Forest Service for the White Pass Ski Area expansion. Plaintiffs, the Hogback Basin Preservation Association, and Sierra Club, challenge the decision by the U.S. Forest Service denying their administrative appeal and approving the ROD and FEIS for the proposed White Pass Ski Area expansion. The ROD approves new ski area development in 767 acres of the Hogback Basin, within the White Pass inventoried roadless area, and headwaters of the Clear Fork of the Cowlitz River - a Tier 2 Key Watershed in the Gifford Pinchot National Forest. Plaintiffs seek an order directing the U.S. Forest Service to withdraw its ROD and FEIS and  enjoining any activity authorized by those documents.

# II.  STATEMENT OF FACTS.

The White Pass Company operates the White Pass Ski Area at White Pass, Washington, under a special use permit with the U. S. Forest Service. FS Answer ¶ 18. The White Pass area is located in the northeast portion of the Gifford Pinchot National Forest and in the southwest portion of the Okanogan and Wenatchee National Forests. *Id*. The ski area is located approximately 50 miles west of Yakima, Washington, 20 and 35 miles east of Packwood and Randall on U.S. Highway 12. *Id*.

Hogback Basin is one of the headwaters of the Clear Fork of the Cowlitz River. *Id*. at ¶ 20. The Clear Fork of the Cowlitz River was designated a Tier 2 Key Watershed by the 1994 Northwest Forest Plan. *Id*. A Tier 2 classification is intended to protect high quality aquatic habitat and water. AR 22832.

In December, 2004, the U.S. Forest Service issued a Draft EIS and accepted public comments on the proposal. FS Answer at ¶ 24. In June, 2007, the U.S. Forest Service issued the FEIS for the proposed expansion of the White Pass Ski Area. *Id*. at ¶ 25. On June 14, 2007, the Forest Supervisors for the Gifford Pinchot National Forest and Okanogan and Wenatchee National Forests issued a ROD based on the FEIS approving the expansion of the White Pass Ski Area. *Id*. at ¶ 26. The Supervisors also approved Amendment No. 19 to the Gifford Pinchot National Forest Plan (GPNFP) as part of the ROD. *Id*.

Amendment No. 19 amends the GPNFP's Riparian Area Standards and Guidelines to allow construction of ski trails, chairlifts, buildings, utilities and associated infrastructure within an area less than 100 feet from the edges of lakes, streams, ponds, wet meadows, marshes and springs located in Riparian Areas. AR 24158. On August 31, 2007, plaintiffs filed an administrative appeal with the Regional Forester for the Pacific Northwest Region. FS Answer at ¶ 27. Plaintiffs' appeal was denied. *Id.* at ¶ 29.

### III.  STATUTORY AND REGULATORY FRAMEWORK.
### The National Forest Management Act and the Northwest Forest Plan.

Under the NFMA, all forest uses must be "consistent with land management plans." 16 U.S.C §. § 1604(i). In 1994, following "a remarkable series of violations of the environmental laws," and an injunction entered by Judge Dwyer in *Seattle Audubon Soc'y* v. *Evans,* 771 F. Supp. 1081, 1089-96 (W.D. Wash. 1991), *aff'd,* 952 F.2d 297 (9th Cir. 1991), the USFS issued what is commonly known as the Northwest Forest Plan (NWFP). 59 F.R. 18788 (April 20, 1994). The NWFP amends the planning documents for 19 national forests, including the Gifford Pinchot National Forest Plan (GPNFP).[1] It directs management of the forests within its geographic reach, and consists of extensive standards, guidelines and land allocations that comprise a comprehensive management strategy. NWFP at 1. The conservation measures included in the NWFP "are based upon the best available science and attempt to forestall future environmental problems . . ." *Id.* These measures replace any conflicting standards and guidelines in the GP Plan, unless such existing plan standards and guidelines are more restrictive.

A key component of the NWFP is the adoption of an Aquatic Conservation Strategy (ACS). NWFP at 9. Two critical components of the ACS are Riparian Reserves and key watersheds. *Id.* Each is expected to play an important role in improving the health of the region's aquatic ecosystems. *Id.* Riparian Reserves are land allocations located adjacent to streams, wetlands, ponds, lakes, unstable and potentially unstable areas, and other areas necessary for maintaining hydrologic, geomorphic and ecological

---

[1]  Management of national forests is conducted through forest plans, adapted under the process set forth in the NFMA, 16 U.S.C. § 1604(a)-(m), and its implementing regulations.

processes, such as seeps and springs. NWFP at B-17. The NWFP establishes standards and guidelines

for managing these areas and prescribes interim Riparian Reserve widths.[2] NWFP at C-30.

> Under the Aquatic Conservation Strategy, Riparian Reserves are used to maintain and re-
> store riparian structures and functions of intermittent streams, confer benefits to riparian
> dependent and associated species other than fish, enhance habitat conservation for organ-
> isms that are dependent on the transition zones between upslope and riparian areas, im-
> prove travel and dispersal corridors for many terrestrial animals and plants, and provide
> for greater connectivity of the watershed.

NWFP at B-13.

Key watersheds are another vital component of the ACS. When the draft NWFP was released for

public comment, there was concern by fisheries, scientists and conservation groups that key watersheds

were not being adequately protected. NWFP at 72-73. In the final NWFP, the USFS acknowledged that

activities in inventoried roadless areas would increase the risk to aquatic and riparian habitat, impair the

capacity of key watersheds to function as intended, and limit the potential to achieve ACS objectives.

NWFP at B-19.

### The Roadless Area Conservation Rule.

In 2001, the USFS enacted the Roadless Area Conservation Rule (Roadless Rule), 36 C.F.R. §

294.10 *et seq*. (2001),[3] which essentially prohibited road construction and reconstruction and timber

harvesting, subject to certain limited exceptions, in inventoried roadless areas (IRAs) on a uniform na-

tionwide basis. With some exceptions, the Rule imposed immediately-effective, national-level, Service-

wide, limitations on new road construction and reconstruction in IRAs throughout the NFS, and also im-

posed nationwide prohibitions on timber harvesting in those areas. Relevant to this case, cutting could

be permitted in narrowly limited circumstances if "incidental" to the implementation of a management

---

[2] The White Pass ski area expansion includes construction activities in Riparian Reserves, and reduces the width of Riparian Reserves from widths established by the NWFP.

[3] The 2001 version of the Code of Federal Regulations constituting the Roadless Rule is binding in this matter by virtue of the decision in *California ex rel. Lockyer v. U.S. Dept. of Agriculture*, 459 F.Supp.2d 874 (N.D.Cal. 2006) that held that the Bush Administration illegally repealed the Roadless Rule and which reinstated the Roadless Rule nationwide except in the Tongass National Forest. Federal defendant acknowledges that "the 2001 [Roadless] Rule applies to management of the IRAs within and adjacent to the proposed expansion area." AR 23374.

activity that was not otherwise prohibited. 36 C.F.R. § 294.13(b)(2).

### The National Environmental Policy Act.

The National Environmental Policy Act (NEPA) is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's purpose is to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* at 1500.1(c). NEPA directs federal agencies to prepare a detailed "environmental impact statement" (EIS) for major federal actions that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). The EIS must address all adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, and any irreversible and irretrievable commitment of resources which would be involved. *Id.* The information presented in an EIS must be of high quality. 40 C.F.R. § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* "It is [a court's] role to see that important legislative purposes are not lost or misdirected in the vast hallways of the federal bureaucracy." *Sierra Club v. Thomas*, 105 F.3d 248, 250 (6th Cir. 1997). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act . . . '[g]rudging, *pro forma* compliance will not do.'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citations omitted).

### The Administrative Procedure Act.

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, "provides that the [final] action of 'each authority of the Government of the United States' . . . is subject to judicial review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Agency actions, findings or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or made "without observance of procedure required by law" are unlawful and must be overturned by a district court. 5 U.S.C. § 706(2)(A),(D).

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

## A.  Standard of Review.

Judicial review of this case arises under the APA. "Agency decisions that allegedly violate [the] NEPA and [the] NFMA are reviewed under the . . . [APA], and may be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.,* 451 F.3d 1005, 1008-09 (9th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)). Although the "arbitrary and capricious" standard of review is deferential, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and this Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citations omitted). "Agency deference has not come so far that we will uphold regulations whenever it is possible to 'conceive a basis' for administrative action." *Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 626 (1986). The Court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## B.  Plaintiffs Have Standing To Bring This Action

To establish standing, a plaintiff must: (1) allege a particularized injury; (2) fairly traceable to the defendant's conduct, which; (3) is likely to be redressed by the requested relief. *Idaho Conservation League v Muma,* 956 F.2d 1508, 1513 (9th Cir. 1992).

Plaintiffs have standing to bring this action. Both groups have members who use, enjoy and plan to return to the Hogback Basin and surrounding National Forest land. Declaration of Erik Splawn filed herewith, ¶¶ 2, 3; Declaration of Mark Lawler filed herewith, ¶¶ 2, 4-6. Both organizations endeavor to protect the natural resources that would be affected by this project. Splawn Decl. at ¶¶ 6-7; Lawler Decl. at ¶¶ 2-4. The interests of both groups and their members would be injured should this project proceed to completion. Splawn Decl. at ¶¶ 4-5; Lawler Decl. at ¶¶ 7-10. Finally, only this court can provide plaintiffs with relief to these injuries.  Plaintiffs have established their standing to bring this action.

# IV.  ARGUMENT.

## A.  The Forest Service has Violated the Roadless Rule, NFMA, and the NWFP.

### 1.  The Forest Service and White Pass Company Violated the Roadless Area Conservation Rule by Approving an ROD that Permits Timber Cutting and Road Construction in IRAs.

Under the Roadless Rule, 36 C.F.R. § 294.10 *et seq*. (2001), road building and timber cutting as-sociated with ski development is allowed only within boundaries of special use permit areas existing at the time it was promulgated. Presumptively, roads cannot be built, and timber cutting cannot occur, in national forest roadless areas to expand ski areas unless such expansion was approved prior to the publi-cation of the Rule in the Federal Register (January 12, 2001). *See, e.g.*, 66 F.R. 3244, 3260.[4] When the Roadless Rule was proposed, defendant White Pass Company sought a "grandfather exemption" from its development restrictions. *Id*. at 3259-60. The Forest Service refused. *Id.*

The development activity proposed in this matter adversely affects three inventoried roadless ar-eas protected under the Roadless Rule: the Goat Rocks IRA, the William O. Douglass IRA, and the White Pass IRA. The impact of the proposed development on the White Pass IRA is so significant that it will result in the removal of 767 acres from the inventory of potential wilderness areas because it will no longer satisfy the criteria for inclusion. FEIS at 3-453 – 454, AR 23379-80. Additionally, a seven-acre parking lot and a 400-square foot ticket booth are to be constructed in the Goat Rocks IRA. FEIS at 2-40, AR 22894.

The ski area expansion at issue is dependent upon the cutting of at least 21.5 acres of timber in the White Pass Inventoried Roadless Area. ROD at 37, AR 24190. The Agency admits that for the ski expansion to occur, cutting trees is "*necessary* [for] clearing widths for chairlifts, ski trails and the mid-mountain lodge" and that the timber harvest is "*required* within the White Pass IRA" *Id*. (emphasis

---

[4] The Agency was sufficiently concerned that the Rule's protections be rapidly implemented that it accelerated the application of the cut-off date for this bifurcated treatment from the Rule's "effective date," as was initially proposed, to the "date of publication" in the Federal Register because it didn't want to wait the additional 60 days that would have been re-quired. 66 FR at 3260.

added). The record is clear that but for the cutting of the trees, the ski area expansion cannot occur.

None of the development activity proposed in this matter was authorized at the time of the Roadless Rule's publication of the Rule in the Federal Register (January 12, 2001). Accordingly, the timber cutting in the White Pass IRA and the parking lot construction in the Goat Rocks IRA are not permitted under the Roadless Rule. Consequently, federal defendant's issuance of the ROD permitting timber cutting in the White Pass IRA and the parking lot construction in the Goat Rocks IRA is arbitrary, capricious, and not in accordance with law.

However, the Agency argues that its decision is lawful under an exception to the Roadless Rule that permits timber harvest if the "cutting, sale, or removal of timber is incidental to the implementation of a management activity not otherwise prohibited by this subpart." AR 24190, citing 36 CFR § 294.13(b)(2).[5] However, as noted above, the timber cutting here is not "incidental" to the subject of this action, it is a prerequisite.

The word "incidental" is defined as an "occurring by chance; of secondary importance; arising out of something else." The New Lexicon Webster's Dictionary of the English Language, 1989. To the extent that this project "requires" the cutting of timber in IRAs, AR 24190, it is barred by the Roadless Rule. Because the SUP at issue is not viable without the cutting of the 22 acres of timber, the cutting is a "necessary," not a secondary — incidental — activity. In this instance, the timber cutting is "incidental" to this project in the same way that the ground floor of a two story house is incidental to the second floor; "but for" cutting 22 acres of trees, this expansion could not proceed.

---

[5] The Agency noted the primary purpose of allowing limited timber cutting in IRAs was that "[a]llowing clearly defined, limited timber harvest of generally small diameter trees will maintain a valuable management option for the agency to help improve habitat for threatened, endangered, proposed, or sensitive species recovery and to help restore ecological composition and structure, such as reducing the risk of uncharacteristic wildfire effects." 66 FR 3244, 3266. It did not intend to foster ski area development. Indeed, the Agency noted that "[o]pportunities for future ski areas or ski area expansion would most likely occur outside inventoried roadless areas on National Forest System land, on other Federal, State, or local government land, or on private real estate." Roadless Rule FEIS Vol. III at 115. "It is unlikely that new ski areas would be built under [the Roadless Rule] unless it already had a Record of Decision before implementation of the final rule." *Id.* Vol. I at 3-226. "Future ski area expansion of any kind outside existing authorized permit boundaries would probably not occur" given the intentionally restrictive nature of the Roadless Rule's proscriptions. *Id.* at 3-227.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471

The Agency's argument ignores the most basic canon of statutory interpretation - that words should be given their plain meaning. *U.S. v. Clarke*, 445 U.S. 253, 254 (1980) ("the meaning of a statute may be determined by the admittedly old-fashioned but nonetheless still entirely appropriate 'plain meaning' canon of statutory construction."); *U.S. v. Wiltberger*, 18 U.S. 76, 96 (1820) ("The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest.").

Similarly, the Agency's assertion that the purported prior degradation of wilderness characteristics in the Goat Rocks IRA acts to allow the construction of a 7-acre parking lot, AR 23379, is without foundation in the Roadless Rule. Such development in the Goat Rocks IRA is clearly barred by the Roadless Rule. 36 CFR § 294.12(a). None of the seven limited exceptions to the bar on road construction presented in 36 CFR § 294.12(b) apply in this case and the Agency cannot craft a new exception to a regulatory proscription on an *ad hoc* basis to satisfy the desires of an SUP applicant.

Finally, the intense and focused development proposed in this matter is contrary to the Roadless Rule's stated purpose of promoting dispersed outdoor recreation. 66 FR 3244, 3245 ("Inventoried roadless areas provide opportunities for dispersed outdoor recreation, opportunities that diminish as open space and natural settings are developed elsewhere."). Although managed skiing is not presumptively barred by the Roadless Rule, the nature and scale of the impacts associated with this development expansion are incompatible with the values and characteristics that the Agency has identified as the basis for the Rule's promulgation. There is no way to adequately mitigate for the severe and permanent environmental impacts caused by development of ski lifts, roads, access "trails" for vehicles, lift towers, power lines, clearcuts and tree removal for ski runs, and a mid-mountain lodge/restaurant. Any of these would impact and compromise the basin's characteristics for wildlife, fish, and public recreation. Any of these would also permanently alter its roadless nature and render it unprotected by the roadless area conservation and would, further, render it unsuitable for addition to the National Wilderness Preservation System. When these deficits are coupled with the violations noted above, it is clear that this proposal is

1   fatally flawed in regards to the precepts and proscriptions of the Roadless Rule.

2

3       2.  The Forest Service and White Pass Company Violated the NFMA, ACS, and GPNFP's Pro-
            hibitions on Development Adjacent to Aquatic Resources.

4

5       The NWFP provides direction for management of habitat for late-successional and old-growth

6   forest species on Forest Service and Bureau of Land Management Lands in the Pacific Northwest in a

7   manner that provides for the species' long-term health. The Northwest Forest Plan amended and was in-

8   corporated into the planning documents of nineteen National Forests and seven Bureau of Land Man-

9

10  agement districts within the range of the Northern Spotted Owl, including western Oregon, western

11  Washington, and northwestern California. The core components of the NWFP include a network of pro-

12  tected habitat areas, including: congressionally protected areas such as wilderness and wild and scenic

13  rivers, late-successional reserves and riparian reserves, key watersheds; an aquatic conservation strategy,

14
15  and a series of standards and guidelines that guide management actions, including requirements to sur-

16  vey and protect habitat for certain rare and uncommon species. Those standards and guidelines are de-

17  scribed and contained in the Record of Decision and attached Appendix A: *Standards and Guidelines*

18
19  *for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the*

20
21  *Range of the Northern Spotted Owl* (Northwest Forest Plan ROD) Signed by the Secretaries of Agricul-

22  ture and Interior in April 1994.

23
24      The NWFP is a "land management plan" as defined by NFMA. Accordingly, all forest uses must

25  be consistent with the NWFP. 16 U.S.C. § 1604(i). A fundamental goal of the NWFP is achieving the

26  objectives of the Aquatic Conservation Strategies (ACS). The ACS is intended to "restore and maintain

27
28  the ecological health of watersheds and aquatic ecosystems contained with them on public lands." The

29  ACS, through the NWFP, requires agencies to manage riparian-dependent resources in order to maintain

30  existing conditions or to implement actions to restore irreparable aquatic conditions. The NWFP estab-

31  lishes widths for Riparian Reserves, in which riparian resources receive primary emphasis, and to which

32  special guidelines apply. Changes to these widths must be scientifically based and fully documented.

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

1
2       The NWFP's Standards and Guidelines (NWFP S&G) emphasize an agency's affirmative duty to
3
protect the status quo of the riparian system: "Complying with the Aquatic Conservation Strategy objec-
4
tives means that an agency must manage the riparian-dependent resources to maintain the existing con-
5
6       dition or implement actions to restore conditions." NWFP S&G at B-10. Moreover, "Management ac-
7       tions that do not maintain the existing condition or lead to improved conditions in the long term would
8       not "meet" the intent of the Aquatic Conservation Strategy and thus, should not be implemented." *Id.*
9       "Standards and guidelines prohibit and regulate activities in Riparian Reserves that retard or prevent at-
10      tainment of the Aquatic Conservation Strategy objectives." *Id.* at B-12. "Under the Aquatic Conserva-
11
12      tion Strategy, Riparian Reserves are used to maintain and restore riparian structures and functions of in-
13      termittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance
14      habitat conservation for organisms that are dependent on the transition zones between upslope and ripar-
15
16      ian areas, improve travel and dispersal corridors for many terrestrial animals and plants, and provide for
17      greater connectivity of the watershed." *Id.* at B-13.

18          The NWFP gives "highest priority" to protecting the few remaining, high quality roadless areas
19
20      in Key Watersheds. *Id.* at B-9. The Gifford Pinchot National Forest Plan (GPNFP) prohibits newly de-
21      veloped recreation sites from expanding within the riparian influence area of aquatic resources. The
22
23      GPNFP further requires that new recreation sites be set back at least 100 feet from the edges of lakes,
24      streams, ponds, wetlands, meadows, marshes, and springs. Because the NWFP establishes minimum
25      standards, the GPNFP setbacks apply only where the NWFP would otherwise allow development within
26
27      100 feet of aquatic sites.

28          Figures 2-5 and 3-25 in the FEIS clearly illustrate how Riparian Reserves, Riparian Influence
29
30      Areas, wetlands, streams, and ponds are specifically targeted for maximum development. AR 23895,
31      23925. The focus of development for the proposed expansion is almost entirely within Riparian Re-
32      serves of the Pigtail and Hogback Basins. AR 23925. These two "water basins" form the entire Tier II

Key Watershed drainage in the proposed project area:

    **A.** The entire Basin Chair 6 including the lower and upper lift terminals, lift towers, associated cleared ski runs, and ditched utility corridors is located in Riparian Reserves.

    **B.** The entire mid-mountain lodge with associated drain field, and ditched utility corridors is located in Riparian Reserves.

    **C.** The Hogback Express Chair 7 lower terminal, most of its associated lift towers, cleared ski runs and ditched utility corridors are located in Riparian Reserves.

The 767-acre expansion area is located within the White Pass Inventoried Roadless Area. In addition, the expansion area is within an ACS Tier II Key Watershed. Ski facilities area to be constructed and operated within 100 feet of aquatic sites. The Federal Defendant admits that the project "would result in an increase of solar exposure reaching streams and wetlands, stemming from the loss of vegetation. Additionally, all Action Alternatives would increase the number of stream crossings, and increase the amount of potentially unstable stream banks." AR 23424. Over 25 acres in Riparian Reserves will be directly impacted by the proposed action. FEIS at Table 3.3-14, AR 23015.

Because the proposed construction and development in the White Pass IRA and the Key Watershed is directly contrary to the 1994 NWFP and the GPNFP, the Federal Defendant's approval of the ROD directly violates the National Forest Management Act and is thus contrary to law.

    3. <u>The Forest Service and White Pass Company Violated the NFMA and NWFP by Improperly Substituting Riparian Influence Area Boundaries for Riparian Reserves to Determine Watershed Functions in Watershed Analysis.</u>

The NWFP's standards and guidelines supersede direction in Forest Plans unless the Plan's direction "is more restrictive or provides greater benefits to late-successional forest related species." NWFP S&G at A-6. The NWFP states that Watershed Analysis is the appropriate place to determine correct Riparian Reserve boundaries. Watershed Analysis has been completed for both watersheds contained within the proposed expansion boundaries, and these analyses' adopted the Riparian Reserve widths recommended by the NWFP.

However, the FEIS Watershed Analysis relies on a narrower measure than the full Riparian Re-

serve boundaries; "the [Riparian Influence Area (RIA)] boundaries for analysis of riparian functions."

AR 22985. "The RIAs are used to analyze particular riparian functions that occur only at that scale.

These riparian functions include sediment filtration, stream bank stability, floodwater storage, LWD in-

put to streams, stream channel shade, and stabilizing stream banks via root structure.' *Id.*

Moreover, the FEIS erroneously eliminates wetland and pond RIAs in the project area. Even

though there are numerous wetland areas depicted in the project area, none have a corresponding RIA.

FEIS Figure 3-29 and Figure 3-20, AR 23929, 23920. The FEIS acknowledges that "the RIA for wet-

lands was not evaluated because the required 300 foot buffer on the 114 mapped wetlands within the

White Pass study Area does not provide a riparian associated measure from which to gain information

concerning impacts to actual riparian zones." AR 22984.That is, including the 300 foot buffer analysis

for wetland RIAs would duplicate the analysis performed for Riparian Reserves." *Id.*

The default width of a Riparian Influence Area around a wetland less than one acre is twice the

default width required for Riparian Reserves (which is the case of most if not all of the wetlands in the

White Pass project area). FEIS at Table 3.3, AR 23903. Therefore, the acreage affected by the develop-

ment is not the same as depicted in the Riparian Reserve, but in fact is much larger. It is clear in the

FEIS' Figure 3-29 how the RIAs associated with wetlands and ponds are dramatically impacted by the

proposed development, especially at the base terminal of Chair 6, the mid-mountain lodge, and the grad-

ing of Holiday Run when the correct buffer widths are implemented. AR 23929. This is a serious flaw of

the Watershed Analysis, considering the whole project is dependent on Amendment 19, which, if ap-

proved, would allow extensive development within these currently protected RIAs.

Because the Federal Defendant's Watershed Analysis improperly substituted RIAs for Riparian

Reserves to provide a narrower scope of protection, and because, further, Federal Defendant incorrectly

calculated the RIAs, the ROD is directly contrary to the 1994 NWFP and the NFMA and is thus contrary

to law.

4.  <u>The Forest Service and White Pass Company Violated Forest Service Regulations for
Amending Forest Plans by Approving Amendment 19 to the GPNFP Despite Its Contradic-
tion with the ACS for Key Watersheds in the 1994 NWFP.</u>

Forest Service Regulations require implementation of a vigorous process, including special no-
tice and comment requirements for "significant" amendments to National Forest Plans. Amendment 19
significantly alters the multiple use goals and objectives for long-term land and resource management by
allowing construction and commercial development activities in riparian areas across 1,572 acres cove
red by the Special Use Permit at issue, including inventoried roadless areas and within a Key Watershed.
The construction and operation of the ski runs, lodge and chair lift facilities, will result in material
changes to – and limitation of – multiple use management options previously applicable to the affected
areas. The impacts of development in the targeted riparian areas will directly and irreversibly undermine
the management options established by the NWFP's Aquatic Conservation Strategy. Therefore,
Amendment 19 directly contradicts the Aquatic Conservation Strategies for Key Watersheds in the 1994
Northwest Forest Plan.

Piecemeal amendments at the local level, such as Amendment 19 to the GPNFP, will have im-
portant effects on the entire NWFP and will significantly alter the long-term relationship between the
levels of multiple use goals and the services originally protected by irretrievably removing the highest
quality habitat in the Key Watershed system. Therefore, the proposed Amendment is a "significant
amendment" and must follow the same procedures that are required for developing and approving the
NWFP. The decision of approving Amendment 19 to the GPNFP violates USFS regulations implement-
ing the NFMA and is contrary to law.

5.  <u>The Forest Service Violated the NWFP's Prohibition of Timber Cutting in Riparian Reserves
by Allowing Tree Removal in a Tier II Key Watershed under Amendment 19.</u>

The entire 767-acre expansion area is within the White Pass Inventoried Roadless Area, and is in
an Aquatic Conservation Strategy Tier II Key Watershed. AR 22811, 22832. In addition, the project area

includes numerous intermittent streams, wetlands and ponds with overlapping Riparian Reserves. AR

23925. The Record of Decision for the "Northwest Forest Plan" places "highest priority" to protect these

remaining high quality Key Watersheds by prohibiting timber harvest in Riparian Reserves. NWFP at C-

31. Amendment 19 to the GPNFP allows for 17 acres of "full clearing" and over seven acres of "tree

removal" within Riparian Reserves for construction of "ski trails, chairlifts, buildings, utilities and asso-

ciated infrastructure." FEIS 1-12, 2-17, AR 22821, 22871;Tables 2.3.1-2, *id.*, and 2.3.4-3, *id.* at 22893;

and Figure 3-25, AR 23925. The Agency admits that one of the unavoidable adverse effects of the pro-

posal would be "clearing in forest stands with old-growth characteristics." AR 23425. The decision of

approving Amendment 19 to the GPNFP violates the NWFP and the NFMA.

## B.   **The Forest Service has Violated NEPA.**

### 1.   The Forest Service and White Pass Company Violated NEPA by Failing to Adequately Consider the Cumulative Impacts of Reasonably Foreseeable Actions.

An EIS must analyze the cumulative impacts of the proposed action when viewed together with

"other past, present, and reasonably foreseeable future actions." 40 C.F.R. 1508.27(b)(7). Cumulative

actions are actions whose impacts result "from the incremental impact of the action when added to other

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "[T]he general rule under NEPA

is that, in assessing cumulative effects, the Environmental Impact Statement must give a *sufficiently de-*

*tailed* catalogue of past, present, and future projects." *The Lands Council v. Powell*, 395 F.3d 1019,

1028 (9th Cir. 2005) (emphasis added); *Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800,

809-10 (9th Cir. 1999) (same). The level of detail must be sufficient to assist "the decisionmaker in de-

ciding whether, or how, to alter the program to lessen cumulative impacts." *Id.* General conclusory as-

sertions from agency experts are not adequate; the agency must provide the underlying data supporting

that rationale in language decipherable to the public; the analysis must include "some quantified or de-

tailed information." *Klamath Siskiyou Wildlands Center v. Bureau of Land Mgmt.,* 387 F.3d 989, 993-94

1
2
3
4
5

(9th Cir. 2004) (citations omitted). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* The discussion must be more than "perfunctory" and must include a "useful analysis." *Id.* The federal defendant did not do so in this case.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

The level of detail demanded by NEPA would necessarily include cumulative impacts associated with nearby ski areas whose markets are interrelated with White Pass. However, here, the FEIS takes a mere two and a half pages to describe the cumulative effects on recreation. FEIS, AR 23332-35. This assessment displays two tables that outline some of the expansion's effects on backcountry recreation in the Upper Clear Fork Cowlitz River and Upper Tieton River watersheds. However, National Forest lands cover approximately 543,000 acres within the entire Cowlitz River watershed and 514,000 acres within the Naches River watershed, which encompasses the Tieton River watershed. Appeal, AR 24838.[6] In comparison, the entire Gifford Pinchot National Forest is 1,312,000 acres, the Wenatchee National Forest is over 2.2 million acres, and the Mt. Baker Snoqualmie National Forest is over 1.7 million acres. The entire affected forest and included recreational ski areas should be considered in the site-specific assessment and development of alternatives.

21
22
23
24

The Agency essentially concedes this point, noting that the cumulative interactions between local ski area use patterns "is best addressed when a specific proposal is made." Response to Comments (RTC), AR 23964, citing USFS correspondence dated December 3, 2001. This referenced letter states:

25
26
27
28

> When a ski area project is proposed, the need for the project can and should address the context in which the proposal fits, which should include an assessment of direct effects to other ski areas. Additionally, the environmental effects analysis conducted, as a part of any proposal, should address cumulative effects. . . of other existing and reasonably foreseeable ski area activities.

29
30
31
32

---

[6] The information was derived from the data provided at: Washington State Major Public Lands Acreages, Washington Department of Ecology, Olympia, WA, 2007, http://www.ecy.wa.gov/services/gis/maps/wria/mpl/mplacreage.htm. (last visited February 27, 2008).

WESTERN ENVIRONMENTAL LAW CENTER
1216 Lincoln Street
Eugene, OR  97401
(541) 485-2471

Letter, AR 07746.[7] Here, a ski area project has been proposed, and thus NEPA requires that cumulative impacts be examined, including "other existing and reasonably foreseeable ski area activities" and "assessment of direct effects to other ski areas."

Additionally, because the specific proposal raises concern regarding the interactive and cumulative effects of all the ski facilities within the market area of White Pass, this concern should have been addressed in the FEIS. As noted above, the Agency itself admits that addressing concerns of cumulative effects "is best addressed when a specific proposal is made."

The market in which White Pass competes for business is generally considered to extend from the Columbia River to Snoqualmie Pass, and on to Stevens Pass and to Mission Ridge. AR 24096-97 (describing parameters as running from Olympia to Vancouver to Yakima WA. and surrounding area). Indeed, the Agency explicitly acknowledges that the Mission Ridge ski area is directly competing with White Pass. AR 24096-97.

Consequently, the appropriate area for cumulative impacts analysis encompasses the White Pass, Crystal Mountain, Summit at Snoqualmie (including Alpental), Stevens Pass, and Mission Ridge developed ski areas. Accordingly, NEPA mandates that the scope of the cumulative impacts analysis include the several million acres of federal public National Forest land contained in all of the developed ski areas from the Columbia River to Snoqualmie Pass, and on to Stevens Pass and Mission Ridge. However, here the FEIS' cumulative effects analysis excludes detailed consideration of the other developed ski areas in the applicable market region.

The FEIS contains a cursory one-sentence statement that simply acknowledges the significance of this expansion in relation to the surrounding ski areas. AR 23333. ("Although the backcountry skiing analysis includes effects outside of the White Pass Study Area, it is included to address public comments received during the public comment period."). General, conclusory assertions from agency experts are

---

[7] Letter from D..Bschor, U.S. Forest Serv., to J. Berman, Colo. Wild (Dec. 3, 2001).

not adequate to fulfill the requirements of NEPA. *Klamath Siskiyou Wildlands Cente.,* 387 F.3d at 995

("[C]onclusory presentation[s] do[ ] not offer any more than the kind of 'general statements about possi-

ble effects and some risk' which [the Ninth Circuit Court of Appeals] ha[s] held to be insufficient to

constitute a 'hard look'").

Therefore, the discussion of cumulative effects in the FEIS, *see, e.g.*, AR 23333, Table 3.11-5

and -6, has been unlawfully constrained to address only those impacts to backcountry recreation within

the White Pass ski area It does not address impacts to areas from the Columbia River to Snoqualmie

Pass, and on to Stevens Pass and/or Mission Ridge as mandated by NEPA. *Klamath Siskiyou Wildlands*

*Center*, 387 F.3d at 994 ("Cumulative impacts of multiple projects can be significant in different ways.

The most obvious way is that the greater total magnitude of the environmental effects-such as the total

number of acres affected or the total amount of sediment to be added to streams within a watershed-may

demonstrate by itself that the environmental impact will be significant"). The USFS's failure to disclose

or analyze these cumulative environmental impacts violates NEPA.

2.  The Forest Service and White Pass Company Violated NEPA by Failing to Analyze
    All Reasonable Alternatives.

Alternatives are the "heart" of the NEPA process and constitute a basic element of USFS's duty

to take a "hard look" at the impacts of a proposed action. 40 C.F.R. § 1502.14; *Native Ecosystems*

*Council v. United States Forest Serv.*, 428 F.3d 1233, 1240 ("NEPA requires us to determine whether

the USFS took a "hard look" at the environmental consequences of a proposed action"). NEPA obligates

federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of ac-

tion in any proposal which involves unresolved conflicts concerning alternative uses of available re-

sources." 42 U.S.C. § 4332(E); *see also* § 4332(2)(C)(iii). NEPA's implementing regulations state fur-

ther that federal agencies must "'[r]igorously explore and objectively evaluate all reasonable alternatives

to a proposed action' so that the agency can 'sharply defin[e] the issues and provid[e] a clear basis for

choice among options by the decisionmaker and the public.'" 42 U.S.C. § 4332(2)(C)(iii); *Kootenai*

*Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1120 (9th Cir. 2002) (*quoting* 40 C.F.R. § 1502.14). Notably, the agency's duty to consider alternatives "is both independent of, and broader than," its duty to complete an environmental analysis. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988).

The Ninth Circuit's "rule of reason" standard "guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Under this standard, the existence of a "reasonable" or "viable" alternative that an agency failed to examine renders an EIS inadequate. *Muckleshoot Indian Tribe v. Forest Service*, 177 F.3d at 814; *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

An EIS is rendered inadequate by the existence of a viable but unexamined alternative. *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815 (9th Cir. 1987), *rev'd on other grounds*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). Environmental review should focus on "reasonable alternatives to proposed actions that will avoid or minimize adverse effects." 40 C.F.R. 1500.2(e). Under NEPA, agencies are required to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

The range of alternatives considered in the FEIS is fundamentally inadequate because it contains four alternatives for downhill skiing and no alternatives for the development of cross-country facilities in the Pigtail and Hogback basins. AR 22876-22907. The Purpose and Need section of the FEIS states that "[t]here is a need for improvement of terrain, facilities, and the recreational experience of the White Pass skier in response to the increasing demand." AR 22823. However, no analysis is given as to how Nordic ski development could alleviate increased demand, nor is there discussion as to the actual demand of Nordic ski facilities.

Numerous comments on the DEIS requested that the USFS present a Nordic ski development, but such an alternative is absent from the FEIS. The USFS responded to these comments by simply re-

1
2
3
4
5
6
7
8

stating that "no additions or modifications would occur under any alternative to the existing Nordic trial and snowshoe trial system." AR 23971. This response does not offer any explanation as to the reason for not contemplating Nordic ski development as an alternative. Additionally, the market demand for such a development was not addressed, despite the FEIS' stated "need for improvement of … recreational experience of the White Pass skier in response to increasing demand." AR 22823. Instead, the purpose and need section limits its analysis to studies done only on the demand for Alpine skiing. *Id.*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Further, the FEIS fails to consider any alternatives involving the development of winter sports facilities at other locations within the applicable market area. The FEIS acknowledges that there are a number of other existing ski areas within the market area, *i.e.*, Crystal Mountain, Mission Ridge, Stevens Pass, and the Summit at Snoqualmie Pass. AR 22811, 23285, and 23302. However, despite this recognition, the FEIS fails to incorporate these related market areas into its limited alternatives analysis. Only the White Pass recreation area is considered for development, which is grossly inadequate under the requirements NEPA. The stated Purpose and Need for the expansion includes a need to "Meet Increased Demand" without any reasoning as to why the demand couldn't be met by a different facility in the market area. FEIS, AR 22824-25. Such an oversight does not fulfill the required "hard look" at the "available resources," and violates NEPA's mandate to "[r]igorously explore and objectively evaluate *all reasonable alternatives* to a proposed action" (emphasis added).

24
25
26
27
28
29
30
31
32

NEPA requires the USFS to consider the development of alternative winter sports sites in this FEIS at issue herein – not in some future environmental document. *Methow Valley Citizens Council*, 833 F.2d at 815 ("it should have appeared obvious that investigation was warranted to determine whether the development of winter sport opportunities could be pursued at alternative sites"). Thus, the USFS's RTC regarding analyzing a Nordic ski development alternative stating that a separate assessment would have to be used to incorporate existing Nordic areas is contrary to NEPA's mandates. RTC, AR 23969. This is inconsistent with NEPA's requirements as well as the Purpose and Need section of the FEIS, which purports to include the need to respond to market demand., AR 22823-24. The federal defendant should

have specifically identified the market and geographic pool of skiers targeted and then considered ski development within that market area. *Methow Valley Citizens Council*, 833 F.2d. at 816 (in order to "provide a clear standard by which it can determine which alternatives are appropriate for investigation and consideration in its EIS . . . the Forest Service should [ ] clearly articulate its goal, specifically identifying the market and geographic pool of skiers targeted."). Here, however, the USFS acknowledges the existence of competing ski markets and the alternative ski sites in the area, but fails to develop alternatives in those areas.

The FEIS provides no meaningful consideration of the development of alternatives or how well such development may fulfill the needs of the public within the market area. Consequently, the FEIS violates NEPA's fundamental requirement that an adequate range of reasonable alternatives be considered.

The FEIS fails to address the options of Nordic skiing development in the Pigtail and Hogback basins. Similarly, the FEIS does not address the potential to satisfy the public desire for Alpine skiing facilities at sites other than at White Pass. The federal defendant instead unlawfully limited its range of contemplated options to those that focus primarily on the profit-making objectives of the White Pass Company. The Forest Service's failure to analyze any alternatives for Nordic skiing in the Hogback basin and its exclusive focus on new development occurring at the White Pass site violates NEPA.

3.   The Forest Service and White Pass Company Violated NEPA by Failing to Consider Environmental Impacts of Electrical Utility Upgrades for the Proposed Expansion.

The FEIS fails to adequately discuss the ramifications of upgraded electrical power delivery to the White Pass ski area to meet the demands of the proposed expansion. The FEIS acknowledges that the power capacity of the existing line is not capable of delivering power needed for the proposed expansion. FEIS, AR 22886, 22894, and 23355. The selected Alternative will require an upgrade of the power line from a capacity of 1550kW to 4000kW. *Id.*

A DEIS comment letter from the Benton Rural Electric Association (BREA) – the utility that

provides electrical power to the white pass ski area – to the USFS, dated February 1, 2005, stated:

> Expansion will require the rebuilding of the power line into the area. *It will also require that the power system reliability be improved by widening the right of way, and the removal of danger trees.* Danger tress are defined by the United States Department of Agriculture as trees which when falling would reach within 5 feet of a point underneath the outside conductor.

*See*, Exhibit D, attached to plaintiffs' administrative appeal (emphasis added).[8]

When it considered the Benton Rural Electric Association's comments, the Agency simply omitted citation to the passage quoted above. RTC, AR 24105. Furthermore, there is no discussion in the FEIS of fire and electrocution hazard of an upgraded power corridor, nor of forest fires, loss of life and property, as a result of an unsafe power corridor lined with "danger trees." A <u>Seattle Post-Intelligencer</u> article dated August 22, 2007, entitled "State sues Okanogan utility over wildfire cost" details a 2005 wildfire caused by a danger tree falling on a utility corridor power line that burned over 1,000 acres, destroyed a sawmill, threatened homes and life, and cost $161,000 in fire fighting costs. Exhibit F, attached to plaintiffs' administrative appeal.

The FEIS does not directly address the BREA's indication that the utility corridor will need to be widened and "danger trees" cut nor does it address the risk and liability potential associated with failure to properly maintain adequate clearances in the utility corridor. Instead, the federal defendant summarily concludes, without references to any evidence, that "[b]ased on recent experience, it appears to be technically feasible to utilize the existing powerline corridor with upgraded conductors and utility poles." FEIS, AR 23355. Curiously, despite stating that the current poles could be used to upgrade, the FEIS also states that the power requirement for Modified Alternative 4 would be substantially similar to Alternative 2. AR 23360. However, Alternative 2 contemplates a need for additional utility poles in order to accommodate for the needed power expansion, which, as the FEIS admits, is the same for both alter-

---

[8] Through an oversight, federal defendant has omitted from the record lodged with the Court, all of the exhibits plaintiffs submitted during their administrative appeal. Consequently, plaintiffs are not at this time able to provide Bates numbers in their citations to these exhibits. Defendant has agreed to correct the record by including these materials. At that time, plaintiffs will file with the Court a table matching appeal exhibit designations to their respective Bates numbers.

natives. AR 23357 and 23360. There is no mention as to how the same power demand for both Alterna-

tives would require additional utility poles in Alternative 2 but not in Alternative 4. Additionally, the

FEIS mentions that in the 11 aerial utility crossing created in conjunction with the utility upgrade would

"eliminat[e] riparian functions within the utility corridor." AR 23020.

As for the buried utility lines, the FEIS acknowledges that such "trenching disturbance would

likely effect [sic] streams more than Alternative 2." AR 23006. However, mitigation is only discussed in

conjunction with entrenched waterlines, and there is no discussion of how this disturbance will affect the

environment. *Id.* It is similarly noted in the FEIS that "[i]mpacts to Riparian Reserves due to [aerial]

utility line installation under Modified Alternative 4 would be greater than under Alternative 2." AR

23020.

The USFS decision approving the Record of Decision and upholding the FEIS is arbitrary and

capricious, an abuse of discretion, not in accordance with law, and violates the National Environmental

Policy Act and its implementing regulations.

4. The Forest Service and White Pass Company Violated NEPA by Failing to Adequately Ad-
dress Sewage Issues.

The White Pass Ski Area has experienced chronic sewage problems, failing drain fields, and in-

cidents of surfacing sewage for over 40 years. The White Pass Company has been cited for public health

law violations and its USFS SUP repeatedly during that time. The USFS has been aware of the serious

sewage problems at White Pass Ski Area, as evidenced by reams of their own documents dated from the

1960s to the present:

> "The drainfield area needs repairs. The draining tank is still not put together. There are
> two separate areas where effluent is pouring over the ground and forming large pools at
> the lower side of the drainfield area. We can not tolerate this any longer. You stated late
> last fall that this would be taken care of this spring 1968. Now it is September 11, 1968
> and the system is still not working." Exhibit I, attached to plaintiffs' administrative ap-
> peal (FS demand letter to White Pass Corp. dated 9/11/68).

> "To date, no real proposal for a solution to the seasonal overflow problem has been pre-
> sented [by White Pass Corp.] . . . As usual, White Pass is not amenable to expending
> funds for a long term correction of the sewage system." Exhibit M, attached to plaintiffs'

1
2
administrative appeal (Lewis Cty. Health Dist. lttr. to FS seeking assistance with continu-
ing drainfield failure. dated 7/6/81).

3
4
5
6
"[You have a] failing drain field with surfacing sewage. . . [I]f sewage is surfacing at any
time after October 15, 1990, it will force the Health District into an enforcement mode.
Since the transient population at the facilities is so great, the chances for disease trans-
mission are very high. The Health District can no longer allow this public health hazard
to continue. " Exhibit P, attached to plaintiffs' administrative appeal (Demand lttr. from
Yakima Health Dist. to White Pass Corp. dated 9/4/90 (emphasis in original)).

7
8
9
10
"Chris Coffin was working for the Yakima Health District in 1993 and investigated a re-
port of discharge of sewage into Leech Lake, and confirmed there was a problem."
2/23/2005. Exhibit H, attached to plaintiffs' administrative appeal, at 2. "There is no re-
cord of a permit and its unlikely that system meets modern code or would be considered
adequate to accept any additional flows" 2/23/2005. *Id.* at 1.[9]

11
12
Despite the well documented history of sewage problems at White Pass Ski Area, there is not

13
adequate discussion of it in the FEIS. Furthermore, the FEIS relies on fecal coliform measurements in

14
15
16
Leech Lake that are over 18 years outdated. AR 22997. Moreover, no water samples have ever been

taken during ski season when the sewage system is running at normal capacity. *Id.* at Table 3.3-8.

17
However, this site historically manifests septic field problems primarily during the ski season. *See, e.g.*,

18
19
20
Exhibit O, attached to plaintiffs' administrative appeal ("The problem is surfacing sewage, which ac-

cording to you, occurs primarily during peak usage time"). Accordingly, there is not adequate baseline

21
of data and the FEIS is therefore flawed. *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857

22
23
24
F.2d 505, 510 (9th Cir. 1988) ("without establishing . . . baseline conditions . . . there is simply no way to

determine what effect [an action] will have on the environment, and consequently, no way to comply

25
with NEPA.").

26
27
The U.S. Environmental Protection Agency (EPA) stated in a comment letter:

28
29
The water quality data in table 3.3-8 includes ortho-phosphorus levels that appear to be
elevated and dissolved oxygen levels that appear to be lower than what would be ex-
pected for the recorded water temperatures.

30
31
AR 24143. Although the EPA requested that this discrepancy be explained in the FEIS, no discussion

32

---

[9] See also plaintiffs' exhibits J, K, L, N, Q, and R attached to their administrative appeal.

was provided in the FEIS. Similarly, the Washington Department of Ecology (Ecology) commented:

> The size of the systems are such that they should be covered by State wastewater discharge permits from Ecology.- Ecology has never issued a permit for either facility. . . *The chemical analysis of Leech Lake included in table 3.3-8 are old (1990)* and are indicative of a lake of a relatively high trophic status (high phosphorus, dissolved oxygen below saturation). The abundance of emergent plants and the epiphytic algae growing on them in recent years are consistent with an elevated trophic status, especially in comparison to Deer and Sand Lake a mile or so to the north in a similar setting (*except for the human activity adjacent to Leech Lake*).

AR 24136 (emphasis added). Ecology continued:

> Leech Lake appears to have an elevated trophic status as a result of the developments around White Pass, including failed wastewater systems. The trophic status of Leech Lake needs to be reviewed in the context of the "natural" conditions and the impact of the development assessed. *A more complete assessment of the wastewater systems needs to be completed, what permits have been issued for the wastewater systems? Why haven't the agreed upon repairs been completed? What is the impact of not completing the repairs? Septic systems are best suited to steady usage, the variation in flows during cold weather (and with long lines to the drain fields) and the extreme variation through the year are likely to result in degraded performance. An assessment of the performance of both septic systems is needed since the drainfield are adjacent to streams of the highest water quality classification in Washington State.*

AR 24137 (emphasis added). The FEIS fails to adequately provided baseline data or discuss the ongoing sewage problems at White Pass and how they affect the surrounding waters as required by NEPA.

## V.  CONCLUSION.

For the foregoing reasons, Plaintiffs respectfully request that its motion for summary judgment on all counts of its complaint be granted and the Court order the relief requested

Dated, this 7th day of March, 2008.

Respectfully submitted,

 /s/David Bahr_____                    /s/ Stephen Tan_____
David Bahr, OSB No. 90199                           Stephen Tan, WSBA No. 22756
Western Environmental Law Center                    Cascadia Law Group, PLLC
HBPA's Trial Counsel                                Sierra Club's Counsel

 /s/Richard Poulin_____
Richard Poulin, WSBA No. 27782
SCOPE Law Firm, PLLC
HBPA's Local Counsel