1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

HOGBACK BASIN PRESERVATION
ASSOCIATION, et al.,

11                    Plaintiffs,                    CASE NO. C07-1913JLR

12          v.                                       ORDER ON CROSS-MOTIONS
                                                     FOR SUMMARY JUDGMENT
13   UNITED STATES FOREST SERVICE, et
     al.,
14
15                    Defendants.

16
17          This matter involves the question of whether the expansion of a ski area,

18   contemplated in varying forms over the past two decades, may proceed on National

19   Forest System land that is regulated simultaneously to preserve its roadless character and

20   to promote the objectives of "Developed Recreation."  On cross-motions for summary

21   judgment, each side contends that its interpretation of the contradictory regulatory

22   framework reconciles these competing demands.  Having heard argument and reviewed

23   the administrative record, the court GRANTS Defendants' motions for summary

24   judgment (Dkt. ## 27, 29) and DENIES Plaintiffs' motion for summary judgment and a

25   preliminary injunction (Dkt. # 25).

26
27
28

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 1

# I. BACKGROUND

Plaintiffs are the environmental organizations Hogback Basin Preservation Association and Sierra Club. Defendants are the United States Forest Service and White Pass Company ("WPC"). The White Pass Ski Area (or "White Pass"), which began operations in 1955, is located on Highway 12 in the Cascade Mountain range of Washington State, approximately 55 miles west of Yakima and 20 miles east of Packwood. WPC operates the ski area under the guidance of the 1979 White Pass Master Plan and the terms of a Special Use Permit ("SUP"). WPC presently seeks to expand its alpine-skiing operations into the neighboring Hogback Basin. The expansion area is located entirely within the Gifford Pinchot National Forest.

In the Washington State Wilderness Act of 1984, Congress increased wilderness lands in the state by over a million acres. *See* Pub. L. No. 98-339, 98 Stat. 299 (codified as amended in scattered sections of 16 U.S.C.) (hereinafter "Wash. Wilderness Act"). The Act has two purposes: (1) to designate certain lands as wilderness "in order to promote, perpetuate, and preserve the wilderness character of the lands, protect watersheds and wildlife habitat, preserve scenic and historic resources, and promote scientific research, primitive recreation, solitude, physical and mental challenge, and inspiration for the benefit of all the American people, to a greater extent than is possible in the absence of wilderness designation," Wash. Wilderness Act § 2(b)(1); and (2) to "insure that certain other National Forest System lands in the State of Washington be available for nonwilderness multiple uses," *id.* § 2(b)(2). To further these dual purposes, Congress added approximately 23,000 acres to the Goat Rock Wilderness Area but also removed approximately 800 acres, including Hogback Basin, from the Goat Rocks Wilderness Area. *See id.* §§ 3(7), 5(b)(3); FEIS 1-5 (AR 22814) (quoting statement by

Rep. Norm Dicks made before the House of Representatives on March 20, 2007); Sen. Rep. No. 98-461, at 10 (1984) (AR 1358); *see generally* James F. Torrence, *Certification of Legal Boundary Description and Map of Goat Rock Wilderness based on 1964 and 1984 Acts* (July 30, 1987) (AR 1708–34). The Act provides that lands removed from wilderness protection "shall be managed for multiple use in accordance with land management plans" and that those lands "need not be managed for the purpose of protecting their suitability for wilderness designation." Wash. Wilderness Act § 5(b)(3).

The present action is the third time the Western District of Washington has been called upon to review Forest Service decisions approving the expansion of WPC's alpine ski operations into the roughly 800-acre portion of Hogback Basin that was removed from designation as wilderness and yet remains within inventoried roadless areas ("IRAs"). Our first opportunity occurred when the Forest Service's 1990 decision to add over 800 acres to the WPC's permit area was administratively appealed and affirmed. *See Nw. Ecosys. Alliance v. U.S. Forest Serv.*, No. C99-759L, Order on Summ. J., at 2 (W.D. Wash. Sep. 26, 2000). In 1992, however, the Forest Service withdrew its decision after an action for judicial review was filed in this court. *See id.*

A few years later, in 1994, the Northwest Forest Plan ("NWFP") went into effect, amending all forest plans within the range of the Northern Spotted Owl, including the Gifford Pinchot National Forest Plan ("GPNFP"). *See id.* The NWFP did not alter the allocation of Hogback Basin to management for "Developed Recreation." Instead, it designated Hogback Basin as an "Administratively Withdrawn Area," which meant that the standards and guidelines of existing forest plans, such as the GPNFP, would continue to apply to the area to the extent they did not conflict with provisions of the NWFP. *Id.* at 3. The GPNFP designates for Developed Recreation management the roadless area

eliminated from wilderness consideration in the Washington State Wilderness Act of 1984. (*See* Record of Decision ("ROD") at 34 (AR 24187); Final Environmental Impact Statement ("FEIS") at 1-5, 3-452 (AR 22814, 23378).) The GPNFP provides that the "Desired Future Condition" for such Developed Recreation is one in which "[r]oads, buildings, ski lifts, tables, docks, and other physical facilities are evident, but design and construction will repeat the color, shapes and lines of the surroundings." U.S. Dep't of Agric., *Land and Resource Management Plan, Gifford Pinchot Nat'l Forest Plan, Pac. Nw. Region*, at 4-6 (1990) (AR 2112) (hereinafter "GPNFP"); *see* ROD at 34 (AR 24187).

In 1997, WPC requested permission to expand its operations into a part of Hogback Basin called Pigtail Basin. The September 1998 Final Environmental Impact Statement and Record of Decision for this project were affirmed on administrative appeal. A number of groups, including Plaintiffs in this case, then challenged the Forest Service's decision in the Western District of Washington, offering this court a second opportunity to review a White Pass expansion plan. The court rejected the Forest Service's fast-track approval process, finding that Defendants had arbitrarily and capriciously endeavored to circumvent the strictures of the National Forest Management Act ("NFMA"), the NWFP, and the National Environmental Policy Act ("NEPA"). Rather than comply with the NWFP's prohibition against building new roads in roadless areas in Key Watersheds, the Forest Service simply amended the GPNFP to redraw the roadless area boundaries and planned to construct a spur road outside of that territory. *See Nw. Ecosys. Alliance*, Order on Summ. J. at 6–7. Furthermore, the Forest Service did not, as required by the NWFP, coordinate with the Regional Ecosystem Office in passing this amendment. Instead the Forest Service "crafted their presentation of the issue in a manner intended to avoid

meaningful review." *See id.* at 8. Having found those violations, the court need not have reached the NEPA claims. It did so, however, "in order to emphasize that defendants' past treatment of the NEPA process may not suffice should the project proposal be treated similarly after it is revised to comply with NFMA and NWFP." *Id.* at 14.

On our third visit to Hogback Basin, the court considers whether the Forest Service, in approving the most recent expansion plan for White Pass Ski Area, has satisfied the substantive and procedural strictures of the Roadless Area Conservation Rule ("Roadless Rule"), the NFMA, and NEPA. In December 2004, the Forest Service issued its Draft Environmental Impact Statement ("DEIS") and accepted public comments on the proposal. In June 2007, the Forest Service issued the Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") for the project. The ROD approved the following: (1) a new White Pass Master Development Plan ("MDP") for the expansion of White Pass Ski Area, consistent with Modified Alternative 4 in the FEIS; (2) an amendment of the White Pass SUP to add 767 acres of Hogback Basin to the SUP area; and (3) Amendment 19 to the GPNFP's Riparian Area Standards and Guidelines in order to allow for construction of ski trails, chairlifts, buildings, utilities, and associated infrastructure within an area less than 10 feet from the edges of lakes, streams, ponds, wet meadows, marshes, and springs located in riparian areas. ROD at 2 (AR 24155). No new roads would be built for the White Pass Expansion. It would, however, involve the cutting of "[o]nly those trees within the necessary clearing widths for chairlifts, ski trails and the mid-mountain lodge." (ROD at 37 (AR 24190).)

On August 31, 2007, Plaintiffs filed an administrative appeal of the ROD, which was denied. Plaintiffs then brought this action to seek an order withdrawing the FEIS and ROD and enjoining the White Pass Expansion. Plaintiffs' Complaint asserted thirteen

causes of action.  On summary judgment, Plaintiffs assert only eight of the thirteen claims:[1] (1) violation of the Roadless Rule, 36 C.F.R. § 294.10 *et seq.* (2001), (Compl. (Dkt. # 1) ¶¶ 32–38); (2) NEPA, failure to adequately consider the cumulative impacts of reasonably foreseeable actions (Compl. ¶¶ 39–43); (3) NEPA, failure to analyze all reasonable alternatives (Compl. ¶¶ 44–52); (4) NEPA, failure to consider environmental impacts of electrical utility upgrades (Compl. ¶¶ 53–59); (5) NEPA, failure to address sewage issues (Compl. ¶¶ 60–66); (6) NFMA, violation of the Aquatic Conservation Strategies ("ACS") (Compl. ¶¶ 96–107); (7) NFMA, violation of the Forest Service regulations involving the amendment of forest plans (Compl. ¶¶ 117–21); and (8) NFMA, Amendment 19 to the GPNFP contradicts the NWFP's prohibition on timber cutting in riparian reserves (Compl. ¶¶ 122–25).

## II.  STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides the authority to review the FEIS and the ROD with respect to the Roadless Rule, NFMA, and NEPA claims.  *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).  The APA provides that a court may set aside final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency."  *The Lands Council v. McNair*, __F.3d__, 2008 WL 2640001, at *4 (9th Cir. July 2, 2008) (en banc) (quotation marks and brackets omitted). The court reverses a decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the

---

[1]Plaintiffs argued nine claims in their briefing.  At oral argument, Plaintiffs withdrew one of these claims.

agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quotation marks omitted).

The court will grant a preliminary injunction when a plaintiff demonstrates either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Id.* (quotation marks omitted). These two options represent the extremes on a single continuum. The less certain the court is of the likelihood of success on the merits, the more a plaintiff must convince the court that the public interest and balance of hardships tips in its favor. *Id.*

## III.  ANALYSIS

Plaintiffs contend that the Forest Service violated the Roadless Rule, the NFMA, and NEPA by approving the expansion of White Pass Ski Area. Defendants counter that the Forest Service properly balanced environmental concerns. It has been eight years since the court found that the Forest Service arbitrarily and capriciously attempted to circumvent the NFMA and NEPA by approving the last White Pass expansion plan. This time through, the Forest Service has exercised greater care in soliciting public comments to the DEIS, responding to them in the FEIS, and setting forth its reasons for approving the present plan of action over its alternatives. The closest question is a matter of regulatory interpretation: whether the ROD violates the Roadless Rule's prohibitions on (1) the construction/reconstruction of roads because the White Pass Expansion calls for the construction of a seven-acre parking lot, and/or (2) timber cutting because 21.5 acres of timber must be cut to accommodate the expansion of ski facilities.

### A.    Roadless Rule

As a preliminary matter, in the FEIS and ROD the Forest Service presumed that the Roadless Rule, 36 C.F.R. § 294.10 *et seq.* (2001), applied to the White Pass

Expansion by virtue of the decision in *California ex. rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006). The parties accepted the Roadless Rule's validity in their briefs and at oral argument. After oral argument, however, the District of Wyoming enjoined the application of the Roadless Rule, finding that it violates the Wilderness Act, 16 U.S.C. §§ 1131–36 (1964), and NEPA. *See Wyoming v. U.S. Dep't of Agric.*, __F. Supp. 2d__, 2008 WL 3397503, at *34, *37 (D. Wyo. Aug. 12, 2008) (also noting that the *Lockyer* court's decision to set aside the State Petitions Rule and reinstate the rule previously in force—the Roadless Rule—was consistent with Ninth Circuit authority). Although the Forest Service called to ensure that the court was acquainted with the existence of the *Wyoming* decision, none of the parties asked to submit supplemental briefing or suggested that the court should approve the White Pass project because the *Wyoming* injunction required the court not to apply the Roadless Rule.

The court presumes that the Roadless Rule remains in-force for two reasons, one substantive and the other prudential. First, the Ninth Circuit dissolved a preliminary injunction of the Roadless Rule issued by the District of Idaho because the parties seeking the injunction had failed to demonstrate a strong likelihood of success on the merits and that the balance of hardships tipped in their favor. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1126 (9th Cir. 2002). Taken together, *Kootenai* and the Northern District of California's *Lockyer* decision strongly suggest that the Ninth Circuit would not adopt the *Wyoming* court's reasoning and would not recognize its injunction of the Roadless Rule. In fact, when the District of Wyoming first enjoined the Roadless Rule—an injunction the Tenth Circuit later vacated as moot—it explicitly rejected Ninth Circuit authority. *See Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1203 n.1 (D. Wyo. 2003) ("[T]his Court finds the *Kootenai Tribe* opinion to be of

limited persuasive value.  Moreover, because this Court is unable to discern what NEPA opinions *Kootenai Tribe* overruled, the Court will refrain from relying on any Ninth Circuit NEPA opinions as persuasive authority."); *cf. Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("While we would consider it bad form to ignore contrary authority by failing even to acknowledge its existence, it is well understood that—in the absence of binding precedent—courts may forge a different path . . . .").  This court has neither the power nor the inclination to reject the Ninth Circuit's jurisprudence on federal environmental law.  Second, no party seeks to enjoin application of the Roadless Rule here.  Plaintiffs request a more rigorous application of the Roadless Rule; the Forest Service is charged with interpreting and enforcing the rule; and WPC developed its expansion proposals employing the Roadless Rule as a limiting parameter.  As a result, the parties have presented neither the argumentation nor the documentation to permit a thorough examination of the Roadless Rule's convoluted and voluminous history.  Given such circumstances, it would not be prudent for this court to ignore the probability that the Ninth Circuit would reject the District of Wyoming's injunction of the Roadless Rule.

The court thus turns to the merits of Plaintiffs' Roadless Rule claims.  Plaintiffs contend that the White Pass Expansion violates the Roadless Rule because the project involves road construction and timber cutting.  Defendants argue that no road is being built and that the timber cutting is specifically exempted from the Roadless Rule's prohibitions.  The development activities approved within 767 acres of Hogback Basin include a parking lot, a ticket booth, two new ski lifts, seventeen ski trails, a 2,000-square foot mid-mountain lodge, utilities, and a water supply line or well.  FEIS at 3-453 (AR 23379).  Most of this development would take place entirely in the White Pass IRA, while half of the proposed seven-acre parking lot and part of the 400-square foot ticket

booth would be located in the Goat Rocks Adjacent IRA, where it has already been substantially impacted by development on the existing SUP area. *Id.*

The purpose of the Roadless Rule "is to provide, within the context of multiple-use management, lasting protection for inventoried roadless areas within the National Forest System." 36 C.F.R. § 294.10 (2001). The Rule contains two primary prohibitions: (1) a prohibition on road construction and road reconstruction in inventoried roadless areas, 36 C.F.R. § 294.12 (2001); and (2) a prohibition on timber cutting, sale, or removal in inventoried roadless areas, 36 C.F.R. § 294.13 (2001). The Roadless Rule "does not compel the amendment or revision of any land and resource management plan." 36 C.F.R. § 294.14(b) (2001). Nor does it "revoke, suspend, or modify any project or activity decision made prior to January 12, 2001." 36 C.F.R. § 294.14(c) (2001).

There is an inherent tension between Hogback Basin's designation in the GPNFP for Developed Recreation management and the Roadless Rule's promotion of roadless area characteristics. Developed Recreation includes "[r]oads, buildings, ski lifts, tables, docks, and other physical facilities." GPNFP at 4-6 (AR 2112). In contrast, resources and features that characterize IRAs include high quality or undisturbed soil, water, and air; sources of public drinking water; diversity of plant and animal communities; habitat for threatened and sensitive species; primitive and semi-primitive forms of dispersed recreation; reference landscapes; natural appearing landscapes with high scenic quality; traditional cultural properties; and other locally identified unique characteristics. 36 C.F.R. § 294.11 (2001). Thus, the Roadless Rule's specific exemptions for road and timber projects largely involve preexisting contracts or decisions; the satisfaction of legal or treaty rights; and environmental preservation, public safety, or the public interest. *See* 36 C.F.R. §§ 294.12(b), 294.13(b) (2001).

Defendants suggest that in passing the Washington State Wilderness Act of 1984, Congress intended to permit the White Pass expansion into Hogback Basin. The Senate Committee on Energy and Resources stated that "[t]he 800 acres deleted from the existing Goat Rocks Wilderness Area have significant potential for ski development and should be managed by the Secretary of Agriculture to utilize this potential, in accordance with applicable laws, rules and regulations." Sen. Rep. No. 98-461, at 10 (AR 1358). The same proposition was reiterated in support of the current expansion efforts by the 1984 Washington State Congressional Delegation and current members of Congress. *See* FEIS at 1-3–1-6 (AR 22812–15) (quoting a 2005 letter signed by the 1984 Congressional Delegation and 2007 statements by Representatives Dicks and Baird).

Neither the 1984 Act's legislative history nor the support the White Pass Expansion garners from current legislators (and past legislators commenting 20 years later) can, however, dispel the confusion that inures from a decision to permit multiple-use recreation in an area inventoried as roadless. Representative Dicks acknowledged as much by referring to "[t]he conflicting, confusing and uncertain status" of the land because the GPNFP took the approximately 800 acres withdrawn from wilderness designation and allocated it to Developed Recreation while concurrently inventorying the same area as roadless. *See* FEIS at 1-5 (AR 22814). If WPC is permitted to expand its ski operations in the IRAs of the Hogback Basin, its project must be "in accordance with applicable laws, rules and regulations." Sen. Rep. No. 98-461, at 10 (AR 1358); *see* FEIS at 1-6 (AR 22815) (quoting Representative Dicks's statement that the White Pass expansion plans should be approved expeditiously "in accordance with all applicable laws, rules, and regulations"). The court presumes that one such applicable regulation is the Roadless Rule. The 1984 Act does not suggest that federal agencies lack the power to

regulate IRAs and no amount of political muscle will permit the White Pass Expansion to proceed if the project violates the Roadless Rule.

Nevertheless, the Forest Service's interpretation of its own regulation is entitled to deference. *See Auer v. Robbins*, 519 U.S. 452, 463 (1997) (noting that an agency has the "power to resolve ambiguities in [its] own regulations"); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (noting that a reviewing court "must give substantial deference to an agency's interpretation of its own regulations"). It is through this lens that the Forest Service's interpretation of the Roadless Rule's prohibitions and exemptions must be viewed. The Forest Service's interpretation of the Roadless Rule is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (quotation marks removed). That home-field advantage tips the balance in favor of the Forest Service here.

### 1.    Parking Lot Versus a Road

Plaintiffs contend that the proposed construction of a seven-acre parking lot violates the Roadless Rule's prohibition on road construction and road reconstruction in inventoried roadless areas. Defendants counter that the Roadless Rule's definition of "road" does not embrace a "parking lot."

The Roadless Rule provides that "[a] road may not be constructed or reconstructed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section." 36 C.F.R. § 294.12(a) (2001). None of the exceptions in paragraph (b) apply here. "Road" is defined as "[a] motor vehicle travelway over 50 inches wide, unless designated and managed as a trail. A road may be classified, unclassified, or temporary." 36 C.F.R. § 294.11 (2001). "Road construction" is defined as "[a]ctivity that results in the addition of forest classified or temporary road miles." *Id.*

"Road reconstruction" is defined as "[a]ctivity that results in improvement or realignment of an existing classified road."[2]  *Id.*

Neither the Roadless Rule nor its explication in the Federal Register specifies that a "parking lot" constitutes a "road."  Plaintiffs therefore appeal to the conservation objectives of the Roadless Rule.  According to Plaintiffs, "each ski season thousands upon thousands of motorized vehicles will travel in, through and out of the Goat Rocks IRA because of the parking lot's construction."  (Pls.'s Consolid. Resp.-Reply (Dkt. # 34) at 9.)  Thus, Plaintiffs argue, there is no meaningful difference between a "travelway" between two locations, and a parking area in a single location that encourages the circulation of motor traffic within a seven-acre parcel.

Although Plaintiffs' point regarding the comparative environmental impacts of roads and parking lots is well-taken, there is no indication that the Roadless Rule's definition of "road" is meant to embrace any paved surface on which a car could drive.[3]  A parking lot is "an outdoor lot for the parking of motor vehicles," and to "park" means "to bring a (vehicle) to a stop" or "to leave temporarily on a public way or in an open space assigned or maintained for occupancy by automobiles."  *Webster's Third New Int'l Dictionary* 1642 (2002).  Although there is movement within a parking lot, a parking lot is defined as the location where such movement ceases—the antithesis of a "travelway."

---

[2]In turn, "road improvement" is defined as "[a]ctivity that results in an increase of an existing road's traffic service level, expansion of its capacity, or a change in its original design function"; and "road realignment" is "[a]ctivity that results in a new location of an existing road or portions of an existing road, and treatment of the old roadway."  36 C.F.R. § 294.11 (2001).

[3]Plaintiffs' reference to another regulation, in which a "parking lot" is listed as a "transportation facility," proves too much.  *See* 36 C.F.R. § 212.1.  There a forest transportation facility is defined as virtually any improvement "appurtenant to the forest transportation system," including "marine access facilities" and "safety devices."  *Id.*  Many marine access facilities and safety devices cannot be equated with "roads."

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 13

Indeed it is only under discrete circumstances that a developer would seek to build a parking lot in a roadless area—who would park in a lot to which no roads lead?—but those circumstances exist here and creative wordplay cannot transform a prohibition on roads into a prohibition on parking lots in light of the deference afforded to an agency's interpretation of its own regulation.[4]

The Forest Service interprets the prohibition on road construction or reconstruction to mean a prohibition on adding road miles or reconstructing road miles. That is a reasonable interpretation. The Tenth Circuit and the District of the District of Columbia both have accepted the Forest Service's explanation that a "road" does not encompass a "construction zone" despite the presence of motorized vehicles in the area because such a zone is not a "travelway." *See Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1226–28 (10th Cir. 2008); *Hammond v. Norton*, 370 F. Supp. 2d 226, 262 (D.D.C. 2005); *cf.* 66 Fed. Reg. at 3249 ("The Roadless Area Conservation Rule, unlike the establishment of wilderness areas, will allow a multitude of activities including motorized uses . . . ."). Similarly, the Forest Service's conclusion here that a "parking lot" does not constitute a "road" is not plainly erroneous or inconsistent with the Roadless Rule.

## 2.  Timber Cutting

A far more difficult question is posed by Plaintiffs' assertion that the White Pass Expansion violates the Roadless Rule's prohibition on timber cutting. Defendants contend that the timber cutting at issue is exempted from that prohibition because it is

---

[4]In explaining the Roadless Rule, the Forest Service stated: "Although other activities may also compromise roadless area values, they resist analysis at the national level and are best reviewed through local land management and planning." 66 Fed. Reg. 3244, 3244 (Jan. 12, 2001). Thus, for example, the construction of a shopping mall in an IRA, while not prohibited by the Roadless Rule, would be reviewed for its consistency with the local forest management plan.

"incidental" to the "not otherwise prohibited" management activity of ski area development, which here involves the construction of ski runs, ski lifts, and a mid-mountain lodge. *See* 36 C.F.R. § 294.13(b)(2) (2001). Plaintiffs counter that the timber cutting cannot be considered "incidental" because the expansion project necessitates cutting 21.5 acres of timber in the White Pass IRA. *See* ROD at 37 (AR 24190).

The Roadless Rule provides that "[t]imber may not be cut, sold, or removed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section." 36 C.F.R. § 294.13(a) (2001). Paragraph (b) provides:

> [T]imber may be cut, sold, or removed in inventoried roadless areas if the Responsible Official determines that one of the following circumstances exists.
> . . . .
> (2) The cutting, sale, or removal of timber is *incidental* to the implementation of a management activity *not otherwise prohibited* by this subpart[.]"

36 C.F.R. § 294.13(b)(2) (2001) (emphases added). The preamble to the Roadless Rule explained:

> Paragraph (b)(2) allows timber cutting, sale, or removal in inventoried roadless areas when *incidental* to implementation of a management activity *not otherwise prohibited* by this rule. Examples of these activities include, but are not limited to trail construction or maintenance; removal of hazard trees adjacent to classified roads for public health and safety reasons; fire line construction for wildland fire suppression or control of prescribed fire; survey and maintenance of property boundaries; *other authorized activities such as ski runs and utility corridors*; or for road construction and reconstruction where allowed by this rule.

66 Fed. Reg. at 3258 (emphases added).

The parties discuss two interlinked questions: (a) whether the White Pass Expansion constitutes an "authorized" activity "not otherwise prohibited" by the Roadless Rule; and (b) whether cutting timber can be considered "incidental" when it is necessary to the construction of ski facilities. However, only the second question is truly in dispute. The parties agree that ski development *can* be authorized under the proper

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 15

circumstances.[5]  *See* 66 Fed. Reg. at 3258.  They part ways on the *terms* of that authorization, which are determined by how expansively or narrowly the word "incidental" is defined in the Roadless Rule's exemption.

The word "incidental" is defined as "subordinate, nonessential, or attendant in position or significance."  *Webster's Third New Int'l Dictionary* 1142.  Defendants fix upon the "subordinate" or "secondary" aspect of the definition.  *See, e.g., Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 364 (1926) ("The interference with commerce, therefore, was direct and primary, and not, as in the cases cited, incidental, indirect, and secondary."); *Molski v. Gleich*, 318 F.3d 937, 950 n.14 (9th Cir. 2003) (noting that "a review of these cases demonstrates that . . . our use of the word 'incidental' was intended to mean 'secondary' to injunctive relief").  Because the cutting of timber is subordinate to the primary purpose of constructing ski facilities, the cutting of timber is "incidental" and therefore permitted.  Plaintiffs fix upon the "nonessential" aspect.  *See, e.g., Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 26–27 (2004) (holding that a contract retained its maritime nature notwithstanding significant transport via land and noting that it was improper to describe the land carriage as "incidental" where each leg of the journey was "essential" to accomplishing the contract's purpose).  Because the cutting of timber is essential to the construction of ski facilities, the cutting of timber cannot be considered "incidental" and is therefore prohibited.  Both sides' definitions of

---

[5]Although Plaintiffs argue that there is no *presumptive* authorization for the development of ski areas in IRAs, they set forth three scenarios in which the Roadless Rule would permit ski development to proceed because the cutting of timber is truly "incidental."  (Pls.'s Consol. Resp.-Reply at 5–6.)  At oral argument, the Forest Service noted that even if the Roadless Rule did not explicitly authorize all forms of ski development, the area may be managed for multiple-use recreation and the agency has now specifically authorized the White Pass Expansion by approving the ROD.  The court agrees that the White Pass Expansion has now been "authorized."  The determinative inquiry is the proper scope of the authorization, i.e., the White Pass project violates the Roadless Rule unless the timber cutting is exempted as "incidental" to the expansion.

"incidental," as presented in their briefing, are plainly erroneous and inconsistent with the Roadless Rule's language and intent.[6]

In their briefing, Defendants proposed that "incidental" should be read interchangeably with and exclusively as "secondary." Thus, any timber cutting on behalf of the White Pass Expansion is exempted from the Roadless Rule's prohibitions because the primary purpose of the project is the installation ski runs, ski lifts, and a mid-mountain lodge. This reading has an alluring simplicity: if the project is not labeled "timber cutting, sales, or removal," regardless of how many trees are cut, any prohibitions on the project would have to be derived from other sources, such as the local forest management plans. The tension inherent in permitting multiple-use management on inventoried roadless areas is resolved in favor of permitting any authorized use. How a project is constructed, as far as the Roadless Rule is concerned, would be immaterial.

Such a definition of "incidental" is unworkable because it would render the Roadless Rule's prohibition on the cutting, removal, or sales of timber a virtual nullity. In enacting the Roadless Rule, the Forest Service rejected a request by a number of respondents, including WPC, to exempt future ski area expansions involving road construction or timber harvesting. *See* 66 Fed. Reg. at 3259–60. Instead, Section 294.14 exempts only a narrow category of projects for which contracts, special use permits, or master plans were in place prior to the Roadless Rule's promulgation on January 12, 2001. The Roadless Rule FEIS noted that "[i]f a proposed project could be designed and built without road construction or reconstruction and timber harvesting (assuming timber harvesting for stewardship purposes is not appropriate for clearings created for developed

---

[6]As discussed below, at oral argument the Forest Service contended that its decision remained proper under a more reasonable definition of "incidental." Neither WPC nor Plaintiffs backed away from absolutist definitions that are inconsistent with the regulation.

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 17

recreation), it could proceed with normal Forest Service procedures . . . ." U.S. Dep't of Agric., *Roadless Area Conservation Final Environmental Impact Statement*, at 3-226 (2001) (hereinafter "Roadless Rule FEIS"), *located at* http://www.roadless.fs.fed.us/ documents/feis/index.shtml (last visited Sept. 8, 2008). Otherwise, "[n]ew construction or projects proposed outside the authorized special use permit boundary in inventoried roadless areas could be subject to the prohibitions; *it would depend on the type of project and how it would be constructed.*"[7] *Id.* (emphasis added). The Rule sets forth specific exemptions to its prohibition on timber cutting, sale, or removal in IRAs, e.g., the cutting of small diameter trees to improve threatened species habitat or to maintain or restore the ecosystem, 36 C.F.R. § 294.13(b)(1); and the harvesting of timber needed for personal or administrative use as specified by regulation, 36 C.F.R. § 294.13(b)(3). The Rule would swallow itself if its exemption involving "incidental" timber cutting actually permitted vast swaths of timber to be cut simply because the primary purpose of a project was to construct a ski resort.

At the opposite end of the spectrum is Plaintiffs' proposed definition of "incidental" to mean "non-essential" or "unnecessary." While timber cutting is not the "primary objective" of the ski expansion project, because timber cutting is essential/necessary to the project, it is prohibited. (Pls.'s Consol. Resp.-Reply at 8.) Plaintiffs suggest three scenarios in which ski development would be "incidental": (1) where the project would be largely outside of IRAs but cross them "incidentally"; (2) where the ski runs do not require the cutting of timber to be viable commercially and recreationally—because tree cover density is low or absent—but for which some

[7]The Forest Service further noted that "[s]ix other proposed projects will not have a decision in place before implementation of the final rule, three are new ski areas and three are expansions of existing ski areas. All of these projects would be subject to the national prohibitions." *Id.*

"incidental" timber cutting would be desirable for reasons of safety, capacity, or related bases; and (3) tree-cutting "incidental" to ski area SUPs and master plans authorized prior to the Roadless Rule's promulgation. (*Id.* at 6.)

Plaintiffs' interpretation of "incidental" is also too extreme. Limiting "incidental" only to "non-essential" or "unnecessary" timber-cutting would excise the section 294.13(b)(2) exemption every time it is invoked for a meaningful purpose. The Roadless Rule does not prohibit timber cutting incidental to "trail construction or maintenance," "fire line construction for wildland fire suppression," or even properly authorized "ski runs." 66 Fed. Reg. at 3258. Each of these projects might require as essential and necessary the cutting of timber and yet not run afoul of the Roadless Rule. Plaintiffs' definition of "incidental" would put a moratorium on trail construction through forested areas or even on suppression of fires when the cutting or removal of trees is also required.[8] It makes little sense to permit the cutting of timber only when unnecessary and gratuitous while prohibiting it when necessary for carrying out a clearly authorized management activity.[9] The Roadless Rule is to be enforced "within the context of multiple-use management," 36 C.F.R. § 294.10 (2001), and exists within the broad charge to the Forest Service to balance competing needs of use and preservation, *Lands*

---

[8] The explication of the Roadless Rule provides that "removal of hazard trees adjacent to classified roads for public health and safety reasons" constitutes an example of an authorized management activity for which the "incidental" cutting of timber would be permitted. 66 Fed. Reg. at 5258. It appears to be self-explanatory that cutting timber "incidental" to the authorized "removal of hazard trees" shows that "incidental" can sometimes encompass "essential" activities.

[9] Plaintiffs suggest that constructing a "fireline" need not involve the cutting of timber. This point refutes rather than supports their position. The National Fire Plan defines "fireline" as "[a] linear fire barrier that is scraped or dug to mineral soil after being cleared of all vegetation." Glossary of Terms, located at http://www.forestsandrangelands.gov/resources/glossary/f.shtml (last visited Sept. 1, 2008). Depending upon the circumstances, it may or may not be necessary to clear vegetation, such as timber, in order to construct a fireline; either way, such timber cutting, reasonably delimited *by necessity*, is permitted.

*Council*, 2008 WL 2640001, at *6. As an 11-0 en banc panel of the Ninth Circuit recently noted, "since Congress' early regulation of the national forests, it has never been the case that 'the national forests were . . . to be "set aside for non-use."'" *Id.* Plaintiffs' interpretation of "incidental" would mean that forest system lands that "shall be managed for multiple use," Wash. Wilderness Act § 5(b)(3), would be, through the Roadless Rule, effectively set aside for non-use.

The drafters of the Roadless Rule intended a context-sensitive interpretation of "incidental" rather than an absolutist application of the term. As the Forest Service conceded at oral argument, there must be circumstances in which the cutting, sales, or removal of timber is so disproportionate—e.g., clear-cutting 700 of the 767 acres in the proposed expanded SUP area—that no amount of deference to the Forest Service's interpretation of the Roadless Rule would permit such activities to be labeled "incidental" to the primary purpose of building a ski resort. Similarly, but on the other end of the spectrum, it simply cannot be that the necessary felling of a single tree to construct a ski resort can never be considered incidental. The proper definition of "incidental" to be applied to IRAs withdrawn from wilderness protection is more flexible and dependent upon the specific circumstances of the proposed activity. As such, the Roadless Rule's use of "incidental" is closest to the third sense of the term that has been neglected by the strong forms of the parties' entrenched positions: "attendant in position or significance." *Webster's Third New Int'l Dictionary* 1142.

The court accepts the Forest Service's suggestion at oral argument and in the FEIS and ROD that its definition of "incidental" as "secondary" or "subordinate" allows for an examination of whether the cutting, removal, or sales of timber is "attendant in position or significance" to an otherwise authorized activity. That is, the Forest Service cannot issue free passes to cut timber for any authorized activity that involves the cutting of

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 20

timber; the agency must examine the significance of the cutting, removal, or sales of timber vis-a-vis that authorized activity. This case-by-case, circumstance-by-circumstance definition of "incidental" is consistent with the Roadless Rule FEIS, which states that whether a project will be prohibited will "depend on the type of project and how it would be constructed." Roadless Rule FEIS at 3-226. "Secondary" or "subordinate" is the floor: any timber cutting that is "incidental" must also be "secondary" to an authorized purpose. However, whether "incidental" timber cutting is also "nonessential," as well as whether the scale or scope of the timber cutting would remove it from being "attendant in position or significance," will depend upon how the timber cutting fits into the authorized project. For example, although cutting timber may be essential to the creation of a forest trail, unless timber cutting begins to rival or overshadow the primary purpose of constructing that trail, it remains "incidental" to the overall project. There is a difference between clearing any vegetation that stands in the way of any development project and cutting timber for a properly vetted project that satisfies the dual objectives of conservation and recreational use.

The White Pass project involves timber cutting that is both essential and secondary to the primary purpose of developing ski facilities. The court therefore must evaluate whether the Forest Service's contention at oral argument that regardless of what the outer contours of "incidental" timber cutting may be, the felling of 21.5 acres of trees entirely within the necessary clearing widths for chairlifts, ski trails, and the mid-mountain lodge does not violate the Roadless Rule because the IRAs are to be managed for Developed Recreation and every effort has been made to minimize and mitigate how much timber is cut. *See* ROD at 37 (AR 24190). The GPNFP Management Prescription 2L provides that "[t]rees may be removed to improve a ski area, provide a scenic view, or accomplish other recreational enhancements." GPNFP at 4-7 (AR 2113). In approving the White

Pass project, the Forest Service purportedly "selected a design that would utilize, to the greatest extent possible, existing openings with clearing focused on tree islands rather than full vegetation removal." ROD at 37 (AR 24190). "Mitigation Measures/design criteria and Other Management Provisions (refer to Section 2.4) would reduce impacts to the natural vegetation by marking maximum trail clearing limits, felling trees away from adjacent vegetation, and limiting maintenance techniques to manual methods within the mountain hemlock parkland community (refer to Section 3.5.3.1 – Vegetation Communities)." FEIS at 3-453 (AR 23379). There is every indication that the Forest Service selected an alternative that balanced the objectives of the project against how the ski facilities could be constructed with the least amount of timber loss and impact on the environment.[10] *See, e.g.*, FEIS 2-53–2-65 (AR 22907–19) ("Resource Protection and Mitigation Measures"). Furthermore, even the alternative advocated by Plaintiffs—which entailed development only within the existing SUP—involved the cutting of approximately 35.3 acres of trees. *Compare* FEIS at 3-453 (AR 23379) (stating that with the proposed plan "[v]egetation clearing for ski trails would increase to approximately 21.5 acres in the mountain hemlock parkland") *with* FEIS at 3-455 (AR 23381) (stating that with the alternative advocated by Plaintiffs "trees could not be retained and a majority of the understory vegetation would be removed on approximately 35.3 acres of mixed conifer vegetation communities").

The court finds that the Forest Service's interpretation of "incidental," as suggested in the FEIS and ROD and modified during oral argument to mean secondary/subordinate and attendant in position or significance, is not plainly erroneous

---

[10]In contrast, the Forest Service concluded that the adoption of the alternative supported by Plaintiffs—which would have restricted development to the existing SUP area—would result in greater impacts to mature forest habitat and perennial streams, thereby reducing spotted owl habitat and adversely affecting Riparian Reserve function. *See* ROD at 26–27 (AR 24179–80).

or inconsistent with the Roadless Rule. The court further finds that the Forest Service did not act arbitrarily and capriciously by concluding that cutting approximately 21.5 acres of timber to construct the proposed ski facilities did not violate the Roadless Rule because "[t]he cutting, sale, or removal of timber is incidental to the implementation of a management activity not otherwise prohibited." 36 C.F.R. § 294.13(b)(2) (2001). The court recognizes the plausibility of Plaintiffs' suggestion that cutting 21.5 acres of timber should never be considered insignificant or "incidental." There are any number of ways to apply the section 294.13(b)(2) exemption to the White Pass project, each reconciling the Roadless Rule's conservation objectives and the GPNFP's management of Hogback Basin for Developed Recreation in a different manner. The court may not, however, select among reasonable alternatives or demand that a ski trail turn left instead of right if both are permissible. The court must defer to the Forest Service's choice to approve the project unless the agency relied on the wrong factors, entirely failed to consider an important aspect of the problem, or offered an implausible explanation. *See Lands Council*, 2008 WL 2640001, at *4. The Forest Service did not violate the Roadless Rule's prohibition on timber cutting because the timber cutting at issue may be considered incidental to the not otherwise prohibited White Pass Expansion.

## B. NFMA Claims

### 1. Aquatic Conservation Strategies

Plaintiffs contend that the Forest Service's approval of the ROD violates the NFMA because it allows construction and development that is contrary to the NWFP's Aquatic Conservation Strategies ("ACS") and the GPNFP's prohibition on developed recreation sites expanding within the riparian influence area of aquatic resources. Plaintiffs have failed, however, to cite *how* the White Pass Expansion specifically violates the NFMA and did not rectify this oversight in their Reply.

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 23

The FEIS contains detailed analyses of the effects of the White Pass Expansion on ACS objectives and riparian reserves and both the FEIS and ROD conclude that all relevant forest plan requirements have been met. *See* FEIS at 3-225–3-320 (AR 23156-23246); ROD at 17–21 (AR 24170–24174), 35 (AR 24188). An agency's actions are presumed to be lawful unless Plaintiffs show otherwise. *See, e.g.*, *Thomas Jefferson Univ.*, 512 U.S. at 512 (holding that a court gives substantial deference to an agency's interpretation of its own regulations and that an agency's action is presumptively valid); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) (holding that a court assesses whether an agency's decision is "within the bounds of reasoned decision making" and does not decide whether it would have made the same decision). Plaintiffs have failed to make such a showing. The court therefore finds that the Forest Service's approval of the ROD did not violate the NFMA through contravening ACS objectives and improperly encroaching upon riparian reserves.

### 2. Procedures in Passing Amendment 19

Plaintiffs contend that Amendment 19 to the GPNFP was a "significant" amendment to the NWFP that required special notice and comment procedures prior to implementation. Amendment 19 amends the GPNFP's Riparian Standards and Guidelines to allow for downhill ski trails and other ski area infrastructure to cross riparian influence areas within the existing SUP area and the proposed expansion area, "where avoidance of these features proves infeasible." FEIS at 2-14–2-15 (AR 22868–22869). The Forest Service does not dispute that significant amendments must follow the special notice and comment requirements; it contends that Amendment 19 was a non-significant amendment. The Forest Service is correct.

Section 1926.51 of the Forest Service Manual provides that changes to the land management plan that are not significant can result from:

1.  Actions that do not significantly alter multiple use goals and objectives for long-term land and resource management.

2.  Adjustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management.

3.  Minor changes in standards and guidelines.

4.  Opportunities for additional projects or activities that will contribute to achievement of the management prescription.

*Forest Serv. Manual* § 1926.51, located at www.fs.fed.us/im/directives/fsm/1900/ 1920.doc (last accessed Sept. 8, 2008). Amendment 19 does not significantly alter the multiple-use goals of the GPNFP, let alone the NWFP, and constitutes a minor change in standards and guidelines. Out of the 1.4 million acres of the Gifford Pinchot National Forest, the Amendment applies only to approximately 1,120 acres within the White Pass permit area. FEIS at 3-51 (AR 22977). Likewise, the Amendment applies to 94.5 riparian influence area ("RIA") acres within the 767-acre expanded permit boundary. *Id.* at 3-63 (AR 22989); *see id.* at 2-14–2-15 (AR 22868-22869); ROD at 2 (AR 24155). Of those 94.5 acres, the Amendment allows for development of a total of 5.9 acres inside RIAs. FEIS at 2-68, 3-96 (AR 22922, 23022).

The forest supervisor considered the criteria and reasonably concluded that Amendment 19 was non-significant. The FEIS details how the expansion of the White Pass Ski Area meets the NWFP ACS objectives in the context of developing recreational facilities without reducing protection to riparian areas. Plaintiffs have failed to show how these analyses and conclusions were erroneous and Plaintiffs failed to address this issue in their Reply. The Forest Service's decision to treat Amendment 19 as a non-significant amendment is entitled to deference. *See Auer*, 519 U.S. at 463. The court therefore finds that Plaintiffs' challenge to the procedures employed to pass Amendment 19 lacks merit.

### 3. Amendment 19 and Restriction on Timber Harvests

Plaintiffs contend that the Forest Service violated the NWFP's prohibition on "timber harvest" in riparian reserves by allowing for tree cutting in a Tier II Key Watershed under Amendment 19. Under the White Pass Master Development Plan, approximately 14.7 acres of Riparian Reserves would be cleared. *See* FEIS 3-94 (AR 23020).

The NWFP prohibits "timber harvest, including fuelwood cutting," in Riparian Reserves, absent three limited exceptions that are not relevant here. NWFP C-31–32 (AR 3718–19). The noun "harvest" means "the act or process of gathering in a crop" or "the gathering in of something other than a crop," while the verb "harvest" means "to gather (a natural product) as if by harvesting . . . <– timber>." *Webster's Third New Int'l Dictionary* 1036.

Plaintiffs argue that "timber harvest" is synonymous with "timber cutting." Although Defendants acknowledge that tree cutting will occur under the White Pass MDP, they counter that a "timber harvest" requires (a) some aspect of commercial sale or consumption, and (b) the downed trees be removed from the site. Defendants are correct.

Although the NWFP generally prohibits timber harvest in Riparian Reserves, the cutting of trees is not prohibited for other purposes: (1) the NWFP provides that road and landing locations will be minimized, not prohibited, in Riparian Reserves (AR 3719); (2) the NWFP allows construction of recreational facilities in Riparian Reserves if they do not prevent meeting ACS objectives (AR 3721); (3) the NWFP allows for designing fire and fuel treatments to meet the ACS objectives (AR 3722); and (4) the NWFP allows for road construction, and presumably attendant tree removal, for mineral activities when no other alternatives exist (AR 3721). Similarly, the term "timber harvest," as employed in the NWFP and related documents, refers to more regularly programmed activities than

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT – 26

is implied by the term "timber cutting." *See, e.g.* NWFP ROD at 7 (AR 3579) ("It is also the area in which most timber harvest and silvicultural activities will be conducted."); U.S. Dep't of Agric. & U.S. Dep't of Interior, *Final Supplemental Environmental Impact Statement for Amendment to the Survey and Manage, Protection Buffer, and other Mitigation Measures Standards and Guidelines* 428 (Nov. 2000), located at http://www.blm.gov/or/plans/nwfpnepa/FSEIS-2000/FSEIS-Vol-1.pdf (last visited Sept. 4, 2008) (noting, in section entitled "Timber Harvest," that [e]ach alternative would directly affect the level of timber available for harvest . . . . The purpose of this section is to display the effects of the alternatives on the Probable Sale Quantity (PSQ)").

A specific design criterion of the White Pass Expansion is that felled trees be retained on-site, FEIS 2-17–2-18 (AR 22871–22872), and nothing indicates that timber will be collected or sold. This demonstrates that no "tree harvest," as the term is reasonably defined by the Forest Service, will occur. The court therefore finds that the Forest Service has not violated the NFMA through violating the NWFP's prohibition on a "tree harvest."

## C.     NEPA Claims

NEPA, 42 U.S.C. §§ 4321 *et seq.*, is a procedural statute that requires agencies to take a "hard look" at environmental consequences through a required decision-making process. *See Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). A "rule of reason" applies to review of an agency's preparation of an EIS, requiring only a reasonably thorough discussion of probable environmental consequences. *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). Reviewing courts do not "fly-speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *See Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997). Instead, courts

make a pragmatic judgment as to whether the form, content, and preparation of the EIS fostered informed decision-making and informed public participation.  *See Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

Plaintiffs raise a number of NEPA claims.  None have merit.

**1.    Cumulative Impacts**

A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7; *see Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954 (9th Cir. 2008).  An agency's examination of cumulative impacts "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004) (quotation marks omitted).  "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.  *Id.* at 993 (quotation marks omitted); *see Bering Strait*, 524 F.3d at 954.  However, the "determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

Plaintiffs contend that the FEIS is deficient because it fails to include other ski areas in Washington within the area of its analysis of recreation-related effects.  They are incorrect.  While NEPA requires the Forest Service to reasonably discuss the cumulative impacts of the White Pass Expansion, it does not require the Forest Service to compile all

possible impacts throughout the National Forest System. The purpose of the White Pass Expansion is to meet the increased market demand for downhill skiing at White Pass and alleviate the conditions caused by its already overtaxed facilities. FEIS at 1-12–1-17 (AR 22821–22926). The Forest Service determined that the recreation-related cumulative effects of the White Pass Expansion would be "primarily centered on the backcountry component of recreation" in the Pigtail, Hogback and Miriam basins as well as on the Goat Rocks Wilderness, and that the appropriate scope of the cumulative effects analysis was the White Pass Study Area. FEIS at 3-408 (AR 23334). Given that the impacts from more distant developed ski areas such as White Pass, Crystal Mountain, Alpental, and Mission Ridge were economic in nature rather than environmental, the Forest Service need not have given more attention to these other ski areas than it already did. *Id.* at 3-408–3-409 (AR 23334–23335) (noting that these ski areas would have no discernable cumulative environmental impacts on the White Pass Study Area or its surrounding wilderness); *see, e.g.*, *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1186 (9th Cir. 1997) (noting that NEPA does not require federal agencies to examine consequences of actions that are purely economic in nature); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1466 (9th Cir. 1996) ("NEPA does not require that an agency take into account every conceivable impact of its actions, including impacts on citizens' subjective experiences. Rather, it requires agencies to take into account environmental impacts on the physical 'world around us.'") (quoting *Metro. Edison v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1982)).

The Forest Service exercised its discretion to set forth the proper geographic scope and exhaustively analyzed the potential cumulative impacts within that relevant geographic area. *See* FEIS 3-1–3-503 (AR 22927–23429). The court finds that the Forest Service did not violate NEPA's requirement to examine cumulative impacts.

## 2. Reasonable Alternatives

Plaintiffs contend that the FEIS failed to consider reasonable alternatives to the White Pass Expansion because it did not consider (a) the development of cross-country facilities in the Pigtail and Hogback basins, and (b) development or expansion of ski areas in alternative locations. Neither Plaintiffs' alternatives is reasonable in light of the purpose and need for the federal action involving White Pass.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). However, an EIS must "[r]igorously explore and objectively evaluate" only "reasonable alternatives." 40 C.F.R. § 1502.14(a). "Alternatives that do not advance the purpose of the [project] will not be considered reasonable or appropriate." *Native Ecosys.*, 428 F.3d at 1247; *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("The range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.") (quotation marks omitted).

The FEIS identified the purpose of the project as follows:

> The overall purpose of the White Pass Expansion MDP is to respond to a request by the White Pass Company to develop and implement a new MDP that is consistent with the amended Forest Plan direction and that would allow expansion of alpine skiing facilities into Hogback Basin.

FEIS at 1-12 (AR 22821). The FEIS also set forth a number of needs: improved parking, pedestrian access and traffic flow on Highway 12, FEIS at ES-2 (AR 22782); increased safety on the ski slopes, *id.*; and the improvement of terrain, facilities, and the recreational experience of the White Pass skier in response to increasing demand for downhill skiing, FEIS at ES-3 (AR 22783). The development of cross-country skiing in

light of increased demand for downhill skiing does not meet any of the projects purposes or needs. Neither does exploring ski development at distant locations when the FEIS was triggered by a proposal from WPC to expand its own alpine skiing facilities.

"When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986). The court finds that the Forest Service did not violate NEPA by failing to consider reasonable alternatives.

### 3. Environmental Impacts of Electrical Utility Upgrades

Plaintiffs rely upon a statement submitted by the Benton Rural Electric Association ("BREA") to contend that the FEIS is defective because the Forest Service failed to adequately analyze the environmental effects associated with the widening of power line right-of-ways. In February 2005, BREA wrote the following comment about the DEIS:

> Expansion will require the rebuilding of the power line into the area. It will also require that the power system reliability be improved by widening the right of way, and the removal of danger trees.

Letter from Charles Isley to Randall Shepard (Feb. 1, 2005) (AR 24876). In the 2007 FEIS, the Forest Service concluded that "it appears technically feasible to utilize the existing powerline corridor with upgraded conductors and utility poles." FEIS 3-429 (AR 23355). The FEIS therefore contains no proposal to widen the powerline right-of-ways.

It was not arbitrary or capricious for the Forest Service to prepare an FEIS that did not analyze the environmental effects of a project it has no intention of undertaking. *See, e.g.*, *Columbia Basin Land Protection Ass'n v. Kleppe*, 417 F. Supp. 46, 52–53 (E.D. Wash. 1976) (noting that the rule precluding agencies from segmenting interconnected projects into discrete insignificant actions to avoid the necessity of preparing an EIS is not shown when no expansion of power line was contemplated in the foreseeable future).

The Forest Service accepted BREA's 2004 suggestions that the power needs for the White Pass project could be met without requiring such a widening. *See* White Pass Expansion ID Team Meeting, at 4 (March 8, 2004) (AR 11494); Telephone Conference Call, at 2 (June 21, 2004) (AR 12878). The one-page 2005 BREA letter contained no further analysis of its statement and does not constitute scientific evidence. The Forest Service proposes here and in its own internal notes that if any widening of the powerline right-of-ways were to become necessary in the future, a separate NEPA compliance process would be necessary. *See* White Pass Steering Committee Notes, at 1 (March 26, 2007) (AR 21013); (Forest Serv.'s Mot. at 21). According to the rule of reason, the Forest Service has not violated NEPA for declining to investigate the environmental effects of an action that it did consider to be a serious alternative and did not approve.

### 4. Sewage Issues

Plaintiffs contend that the Forest Service violated NEPA by ignoring the documented presence of raw sewage in Leech Lake. This assertion is based primarily upon a letter by Phelps Freeborn, an employee of the Washington Department of Ecology writing in his capacity as a private citizen, who states that "[i]n 1993 (I think that is the correct year), a complaint was received of raw sewage discharging to Leech Lake and documented, that is after the upgrade completed during 1991-1992." Letter from Phelps Freeborn to Randall Shepard (February 20, 2005) (AR 24136). In an e-mail message, Mr. Freeborn clarified that it was a third party who investigated this complaint and confirmed a problem. E-mail Message from Phelps Freeborn to Richard Benson, et al. (Feb. 23, 2005) (AR 24149). This isolated report, of dubious accuracy, is the only allegation of a discharge of raw sewage in the nearly two decades following the upgrade of the White Pass wastewater system.

There is no indication that the Forest Service failed to adequately consider the wastewater impacts associated with the proposed project. The Forest Service contacted the Department of Ecology, the Department of Health, and local county authorities to discuss the status of Leech Lake and to ascertain whether there had been any reports of sewage discharges from the White Pass Ski Area. None of these agencies had any documented complaints about spills or leeching. FEIS at RTC-8 (AR 23961). In response to Mr. Freeborn's concerns and an EPA comment that the DEIS contained discrepancies regarding elevated ortho-Phosphorous levels and low dissolved oxygen levels, the Forest Service noted that the baseline information "was updated to provide the best available water quality data for Leech Lake," FEIS at RTC-56–RTC-57 (AR 24009-24010), and provided a table listing additional sampling of Leech Lake conducted in 2006, FEIS at 3-71 (Table 3.3-8) (AR 22997).

It may be true that much of the data the Forest Service relied upon was from the early-1990s. Nevertheless, given the paucity of verifiable, recent complaints, a 2006 update to certain measurements, and Plaintiffs' failure to provide contradictory scientific evidence or analysis, the Forest Service was entitled to rely on the reasonable opinions of its own experts. *See, e.g.*, *Lands Council*, 2008 WL 2640001, at * 17 (holding that Forest Service need not affirmatively address every uncertainty in an EIS but must acknowledge and respond to comments made by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist); *Salmon River*, 32 F.3d at 1359 (holding that an agency may rely upon the reasonable opinions of its own experts). The Forest Service therefore did not violate NEPA by failing to adequately consider concerns about the White Pass wastewater system.

## D. Preliminary Injunction

Had Plaintiffs demonstrated a strong likelihood of success on the merits, they would need only to make a minimal showing of harm to justify a preliminary injunction. *See Kootenai Tribe*, 313 F.3d at 1124. Because plaintiffs have at best raised serious questions going to the merits of a single issue—violation of the Roadless Rule's prohibition on timber cutting—the court examines whether the balance of hardships tips so sharply in Plaintiffs' favor that the court should preliminarily enjoin the White Pass Expansion. *See Lands Council*, 2008 WL 2640001, at *4; *Kootenai Tribe*, 313 F.3d at 1124.

The court recognizes the public interest in conserving natural resources, as well as the fact that losing 21.5 acres of timber is neither trivial nor remedied simply by planting new trees. Plaintiffs' attempt to persuade the court that the balance of hardships tips sharply in their favor is, however, complicated by the dual objectives of the Washington State Wilderness Act of 1984—conservation and multiple use—and the contradictions that inure from applying the Roadless Rule to a non-wilderness area managed for Developed Recreation. Defendants have demonstrated that further delaying the White Pass Expansion would harm the public interest, including the WPC's ability to serve the public's increased demand for downhill skiing. The Forest Service notes that topography and terrain breaks in the existing White Pass Ski Area limit the configuration of ski trails such that visitors with very different skill levels are forced into trail bottlenecks, where overcrowding leads to injuries and safety concerns. ROD at 7 (AR 24160); FEIS at 1-13 (AR 22822); *see, e.g.*, (McCarthy Decl. (Dkt. # 28) ¶ 16; Pursley Comment dated Dec. 30, 2004 (AR 15717); Willis Comment dated Jan. 3, 2005 (AR 15721); Hamilton Comment dated Jan. 27, 2005 (AR 15760); LaFramboise Comment dated Jan. 27, 2005 (AR 15764); Secrist Comment dated Jan. 27, 2005 (AR 15768)). The White Pass

Expansion would increase the variety of terrain for skiers at all skill levels and help to alleviate overcrowding. FEIS at 1-13 (AR 22822); *see* (McCarthy Decl. ¶ 15). The White Pass Expansion also would provide for safer parking facilities and pedestrian flow: half of the present parking capacity for the ski area is located directly on Highway 12, which forces visitors to walk along the highway or to cross the highway to access ski runs. FEIS at 1-13 (AR 22822); *see, e.g.*, (Simonson Comment dated Jan. 27, 2005 (AR 15771); Fenner Comment dated Jan. 27, 2005 (AR 15776); Williams Comment dated Feb. 7, 2005 (AR 15857)).

The Forest Service fully addressed the White Pass Expansion's environmental impacts and concluded that the plan is designed to minimize tree removal. The court thus would be justified in enjoining the project only if the loss of 21.5 acres of timber in a non-wilderness area set aside for Developed Recreation clearly outweighs the Forest Service's attempt to respond to the public's increased demand for downhill skiing and to the safety concerns that stem from the presently inadequate and overcrowded ski facilities. Neither Congress nor the Ninth Circuit has suggested that the balance between conservation and multiple-use objectives should be skewed only toward conservation. *See Lands Council*, 2008 WL 2640001, at *6 ("Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System Lands. . . . The NFMA references 16 U.S.C. §§ 528–31 and requires that plans developed for units of the National Forest System 'provide for multiple use and sustained yield of the products and services obtained therefrom . . . and [must] include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.'"). Because the balance of hardships either tips minimally in favor of Plaintiffs or is equipoised between Plaintiffs and Defendants, the court denies Plaintiffs' motion for a preliminary injunction of the White Pass Expansion.

# IV.  CONCLUSION

The court GRANTS Defendants' motions for summary judgment (Dkt. ## 27, 29)

and DENIES Plaintiffs' motion for summary judgment and a preliminary injunction (Dkt.

# 25).

DATED this 9th day of September, 2008.

_____

JAMES L. ROBART
United States District Judge